IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ANGELA SWAGLER, *et al.* | * | |
| Plaintiffs, | * | |
| | * | Civil Action No.: RDB-08-2289 |
| v. | * | |
| COLONEL TERRENCE SHERIDAN, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On September 3, 2008, Plaintiffs Angela Swagler and Elizabeth Walsh (the "Swagler Plaintiffs") filed the present action asserting numerous constitutional and common law claims relating to a dispersal order, and subsequent arrest, search, and detainment that occurred after the Plaintiffs participated in a pro life demonstration on August 1, 2008, in Harford County Maryland. The named Defendants in that case include three Bel Air police officers: Deputy Chief Armand Dupre, Colonel Zulauf, and Officer Ravadge (collectively, the "Bel Air Defendants").[1] A companion case, filed on July 23, 2009, by fellow demonstrators Jack Ames, Laura Beeson, Nathan Cain, Patrick Mooney, Albert Stecklein III, Timothy Sullivan, Jessica Ward, and Defend Life, Inc., (the "Ames Plaintiffs") asserts similar claims against the same defendants. By Order of February 4, 2010, this Court consolidated the two cases pursuant to Federal Rule of Civil Procedure 42. (*See* Feb. 4, 2010 Order, ECF No. 140.)

---

[1] This Court is presently considering dispositive motions and cross-motions submitted by the plaintiffs and other named defendants. This Memorandum Opinion concerns *only* those defendants referred to above as the "Bel Air Defendants." In addition, and in light of the fact that Harford County and the Plaintiffs have reached a settlement in this matter, this Court re-captioned this case during the hearing conducted on June 16, 2011 to reflect the fact that Harford County is no longer a party to this litigation. *See* Order of June 27, 2011, ECF No. 232.

On June 16, 2011, this Court heard oral argument on all pending motions in this case, including the Bel Air Defendants' Motion for Summary Judgment, Defend Life's Cross-Motion for Summary Judgment, and the Ames Plaintiffs' Cross-Motion for Summary Judgment. For the reasons that follow, the Bel Air Defendants' Motion for Summary Judgment (ECF No. 189) is granted and Plaintiffs' Cross-Motions for Summary Judgment (ECF Nos. 191 and 192) are denied.

<u>BACKGROUND</u>

The underlying factual allegations of this case have been fully explicated in previous opinions and will not be fully reiterated here. As this Memorandum Opinion concerns only the Bel Air Defendants, only those facts relating to their involvement will be discussed herein.

Plaintiffs[2] were participants in the 2008 "Face the Truth" tour, a demonstration event sponsored by Defend Life, Inc., a non-profit pro-life advocacy group. On Friday, August 1, 2008, at approximately 4:00 p.m., Plaintiffs and several other individuals staged an abortion protest near the intersection of Routes 24 and 924 in Harford County. The demonstrators held signs of varying sizes that contained pictures and words that conveyed an anti-abortion message.

After receiving calls from complaining motorists, Maryland State Troopers Christopher Bradley, Charles Neighoff, and Walter Rasinski arrived at the scene of the demonstration shortly after 4:00 p.m. Trooper Bradley informed the demonstrators that they needed a permit to protest and he threatened to place them under arrest unless they disbanded. *See* Face the Truth Video, Swagler Pls.' Mot. Summ. J. Ex. 25.

The demonstrators then moved their protest to the intersection of Route 24 and MacPhail Road, which is inside the Bel Air town limits and several miles from the first location. At

[2] As previously mentioned, this consolidated action involves two separate groups of Plaintiffs. But, as the Swagler Plaintiffs have joined the Ames Plaintiffs' Response and Motion for Summary Judgment, this opinion will use "Plaintiffs" to refer to all Plaintiffs unless discussed by name.

approximately 5:30 p.m., Troopers Bradley, Neighoff, and Rasinski returned with three additional State Troopers. Upon arrival, the Troopers immediately arrested eighteen of the demonstrators, including the Plaintiffs.[3] (Swagler Pls.' Opp'n, 11, ECF No. 193-1; Rasinski Dep. 139:22—140:9, ECF No. 193-25.) As part of the arrest, the Troopers lined the arrestees up along the guardrail of Route 24.

In response to a dispatch which requested assistance for Maryland State Police "with protestors," four Bel Air police officers (Officer Donald Ravadge, Corporal Mark Zulauf, Corporal Michael Clymer, and Deputy Chief Armand Dupre) arrived at the scene.[4] The facts pertaining to each individual Bel Air Defendant are discussed in turn:

**Officer Ravadge**

Officer Ravadge was the first of the Bel Air Officers to arrive at the scene. (Ravadge Dep. 45:12-21, ECF No. 193-15.) Upon his arrival, he saw seventeen or eighteen people sitting on the guardrail. (Pls.' Opp'n ¶ 45) Officer Ravadge recognized Trooper Neighoff, who was already applying handcuffs to one of the arrestees. (Id. ¶ 46.) Trooper Neighoff told Officer Ravadge that "the reason for the arrest was for failing to obey an order to 'leave the area' because of 'not having a permit.'"[5] (Id. ¶ 55.) Trooper Neighoff instructed Officer Ravdage who he should handcuff. (Ravadge Dep. 61:4-12.) Officer Ravadge testified that he handcuffed or flex-cuffed five or six people (both male and female). He also searched six or seven men

---

[3] Eighteen of the protestors – those whom State Troopers identified as members of the first protest at the intersection of Routes 24 and 924, (Neighoff Dep. 212:6-19, ECF No. 193-26.) – were arrested. (Pls.' Opp'n ¶ 1.)

[4] Corporal Clymer is not a party to this lawsuit. In addition to these Bel Air Police officers, three Harford County Sheriffs also responded to the scene. As previously mentioned, Harford County has reached a settlement agreement with the Plaintiffs in this case. *See supra* note 1.

[5] Officer Ravadge also testified in his deposition that Trooper Neighoff told him that "all the people that he had there had been arrested," (Ravadge Dep. 50:7-13) and that Officer Ravdage was needed "to assist subsequent to the arrest to secure for transport." (Ravadge Dep. 50:12-13.)

before loading them into the van for transport to the State Trooper Barracks.[6]  (Pls.' Opp'n ¶ 47.)

However, no plaintiff testified that he or she was handcuffed by Officer Ravadge or was

searched by him.  On the orders of his supervisor, Corporal Clymer, (Pls.' Opp'n ¶ 52), Officer

Ravadge performed a cursory search of Plaintiff Laura Beeson before transporting her to the

State Trooper Barracks in his police car.  (*Id.* ¶ 51.)  This cursory search is the only direct contact

Plaintiffs can point to concerning Officer Ravadge and the individually named plaintiffs in this

case.

**Corporal Zulauf**

Upon arrival, Corporal Zulauf observed the arrestees sitting along the guardrail.  (Zulauf

Dep., ECF No. 198-6, 10:10-14.)  No State Trooper approached him and he did not participate in

the handcuffing or loading of the arrestees.  (*Id.* at 24:14-18, 29:4-6; Pls.' Opp'n 14.)  He

testified that part of his role was to provide a "show [of] force."  (Pls.' Opp'n ¶ 67.)   Corporal

Zulauf did not know why the protestors had been arrested and did not learn of the nature of the

charges until he read about them in the newspaper.  (*Id.* ¶¶ 80-81.)

**Deputy Chief Armand Dupre**

Deputy Chief Armand Dupre was the highest ranking officer from the Bel Air Police

Department at the scene of the arrest.  (Pls.' Opp'n ¶ 15).  He traveled to the scene in order to

---

[6]  The Plaintiffs later suggest that Officer Ravadge searched all of the male plaintiffs before they got into the van. (*See* Pls.' Opp'n ¶ 50; Pls.' Reply 2 n.1, , ECF No. 215.)  In so claiming, the Plaintiffs cite the following passage from Officer Ravadge's Deposition:
**[Counsel for Plaintiffs] Q**:
    Okay.  And how did you know who to conduct the contraband search of?
**A**:
    Anybody that was standing there.  The troopers at the time put everybody in a line that was going to be transported, the transport wagon pulled up on the shoulder, everybody that was in the line that was getting in, prior to them getting in, I just searched them right there at the back of the van.

"check on [his] officers." (*Id.* at ¶ 16). When he arrived, Deputy Chief Dupre observed the protestors sitting along the rail. (Dupre Dep. 26: 7-8, ECF No. 193-14.) No State Trooper initially approached him, (Pls.' Opp'n ¶ 27), and he did not participate in the handcuffing or loading of the arrestees. (Dupre Dep. 32:9-12; Pls.' Opp'n 14.) After all of the Bel Air Police Officers had left the scene, Deputy Chief Dupre departed. (Pls.' Opp'n ¶ 16). Dupre knew that the Maryland State Troopers had "addressed" the arrestees "at a prior location," but he did not know the manner in which they had been addressed. (*Id.* at ¶ 26)

**Events Following the Arrest**

Following the arrests on Route 24, the Troopers prepared and filed the paperwork pertaining to the arrests. The Maryland State Police Criminal Complaint Control Card states that the arrestees "were arrested at location by 8 msp, 4 bel air towne [City of Bel Air], and 3 hcso [Harford County Sheriff's Office]. (Pls.' Opp'n ¶ 26.)[7] Similarly, the Statement of Probable Cause, written by Maryland State Trooper Charles Neighoff soon after the arrest, stated that additional troopers "arrived along with three Bel Air PD officer's [sic] Ravadge #124, Zulauf #113 and Cpt. Dupre #51 and three HCSO Deputies" and that "[u]pon arrival of the additional units, we placed the group under arrest." (Swagler Pls.' Ex. 20, 2, ECF No. 193-23,.)

Plaintiffs were charged with loitering, under Harford County Code, § 193-4(B)(1), disorderly conduct, under MD Code Ann., Crim. Law Art., § 10-201(c)(2), and failure to obey a lawful order, under MD Code Ann., Crim. Law Art., § 10-201(c)(3). However, they were not

---

[7] Plaintiffs cite the Criminal Complaint Card as "*Swagler* Exhibit 17, Criminal Complaint Control Card # 2." However, that Exhibit actually contains only Criminal Complaint Control Card #1. The Court has accepted that version of the card as presented in the Plaintiffs' Statement of Material Facts contained in Pls.' Opp'n, ECF No. 192-1. The text, quoted in full, reads:

> Name of Group—Defend Life Inc. [S]ubjects disobeyed lawful order to leave Harford County from the original place they were at 24 @ 924 [the intersection of Routes 24 and 924] and were arrested at location by 8 msp, 4 bel air towne [City of Bel Air], and 3 hcso [Harford County Sheriff's Office].

charged under a Harford County permit requirement, despite the fact that Defendant Neighoff's arrest report cites the permit requirement as a basis for the arrest. Indeed, no such permit requirement exists. On August 12, 2008, the State entered a *nolle prosequi* of the entire case against all demonstrators in the District Court of Maryland for Harford County.

In their Second Amended Complaints (ECF Nos. 125 and 168), Plaintiffs assert several claims under 42 U.S.C. § 1983 alleging constitutional violations of their First and Fourth Amendment rights. Specifically, the Plaintiffs assert that the Bel Air Defendants, by participating in the arrest, illegally silenced their speech with the design of preventing the Plaintiffs "from continuing their First Amendment-protected pro-life advocacy." (Ames Sec. Am. Comp. ¶ 86.)[8] They allege that the Bel Air Defendants "acted according to a policy, custom, practice, or order of defendant Bel Air, issued, approved, or ratified, on information and belief, by its Chief of Police, of suppressing speech deemed offensive to members of the public, and assisting the State Police in effecting any arrests necessary to eliminate the offense." (*Id.* ¶ 95.)[9] In Count IV, the Plaintiffs further allege that the Bel Air Defendants "violated the plaintiffs' Fourth Amendment right to be free from unreasonable seizure when [they] acted jointly to arrest and confine plaintiffs without probable cause or any other legal justification." (*Id.* ¶ 107.) Lastly, the Plaintiffs assert a variety of claims under the Maryland Declaration of Rights. (*Id.* ¶ 142, 148.)

The Bel Air Defendants have moved for summary judgment on all of the Plaintiffs' claims. Pending before this Court is the Bel Air Defendants' Motion to for Summary Judgment (ECF No. No. 189), Defend Life's Motion for Summary Judgment (ECF No. 191), and the Ames

---

[8] The Swagler Plaintiffs allege virtually identical claims in their First Cause of Action. (Swagler Sec. Am. Comp. ¶¶ 125-35.)

[9] The Swagler Plaintiffs allege virtually identical claims in their Third Cause of Action. (Swagler Sec. Am. Comp. ¶¶ 141-49.)

Plaintiffs' Motion for Summary Judgment (ECF No. 192), which was joined by the Swagler Plaintiffs.  (ECF No. 197.)

<u>STANDARD OF REVIEW</u>

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id*. at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249-50.  On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,*

166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

When both parties file motions for summary judgment, as here, the court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert denied*, 540 U.S. 822 (2003); *see also havePower, LLC v. Gen. Elec. Co*., 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

ANALYSIS

The theories on which Plaintiffs seek to impose liability on the Bel Air Defendants are all premised on the fact that some First or Fourth Amendment Constitutional violations did in fact occur as a result of the Maryland State Troopers' activity in the case. While it is beyond the scope of this opinion to delve into those alleged constitutional violations,[10] this Court will assume *arguendo* that the Plaintiffs' constitutional rights were in fact violated by at least some of the Maryland State Troopers. The question therefore becomes whether the Bel Air Defendants may be held liable for those constitutional violations.

Based on the undisputed facts, this Court holds that no reasonable jury could find that the Bel Air Defendants violated the Plaintiffs' First or Fourth Amendment rights. First, the Defendants were neither direct nor "integral" participants in the arrest of the Plaintiffs. Nor are the Bel Air Defendants liable to the Plaintiffs as bystanders to a violation of the Plaintiffs' rights. Lastly, even if the Bel Air Defendants were found to have committed a constitutional violation, they are unquestionably shielded from liability under the doctrine of qualified immunity.

**I. Failure to Establish Constitutional Violations**

---

[10]  The issue of alleged constitutional violations committed by the Maryland State Police will be addressed in a forthcoming memorandum opinion issued by this Court.

The Plaintiffs assert both First and Fourth Amendment Claims against the Bel Air Defendants as a result of the officers' alleged participation in an unlawful arrest of the Plaintiffs. Accordingly, the Plaintiffs' arrest is the lynchpin of the Plaintiffs' claims. By participating in that allegedly illegal arrest, the Plaintiffs assert that the Bel Air Defendants illegally silenced their speech and violated their First Amendment rights.

## A. The Bel Air Defendants Did Not Arrest the Plaintiffs

Based on the undisputed facts, this Court holds that no reasonable jury could find that the Bel Air Defendants arrested the Plaintiffs. According to the Supreme Court of the United States, "[a]n arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority." *California v. Hodari D.,* 499 U.S. 621, 626 (1991).

The Plaintiffs offer the Troopers' preliminary reports (the Maryland State Police Criminal Complaint Control Card and the Statement of Probable Cause) as evidence that the Bel Air Defendants directly participated in their arrest because 1) the Plaintiffs submitted to the authority of, among others, the Bel Air Defendants and 2) Officer Ravadge participated in handcuffing of some of the arrestees. These general statements are contradicted by the Plaintiffs' characterization of events. As the Plaintiffs emphasize, all of the protestors submitted peacefully to their arrest. (*See* Swagler Pls.' Opp'n 12, 39, ECF No. 193-1; Meades Dep. 30:13-16, ECF No. 193-11; Walsh Dep. 112:16-21, ECF No. 193-2.) No Plaintiff identified Officer Ravadge or any of the other Bel Air Defendants as their arresting officer.[11] Instead, Trooper

---

[11] Plaintiffs Walsh, Ames, and Cain testified that they were arrested by Trooper Neighoff. (Walsh Dep. 112:5-11, 120:2-6; Ames Dep. 162:8-21, ECF No. 193-4; Cain Dep. 97:18-21, ECF No. 190-23.) Plaintiff Angela Swagler testified that she was arrested by either Nuzzo or Mohr. (Swagler Dep. 61:15-21, 62:11-13, ECF No. 193-3.) Plaintiff Ward testified that she did not know who specifically arrested her, (Ward Depo 85:10-11, ECF No. 190-26), but stated that the Troopers "were arresting [the protestors] all at the same time." (*Id.* at 85:8-9.) The testimony of the other Plaintiffs has not been offered to this court in complete form.

Neighoff, the primary arresting officer, testified that he made the decision to arrest.[12]  (Neighoff

Dep. 158:1-2, ECF No. 193-26.)  Each of the three Bel Air Defendants testified that he arrived

on the scene *after* the Plaintiffs had been lined up along the guardrail – a fact that the Plaintiffs

have not contested.  Deputy Chief Dupre and Corporal Zulauf neither spoke to nor had contact

with the protestors.  As such, neither Dupre nor Zulauf could have arrested the Plaintiffs by

"physical force" or by directly eliciting the Plaintiff's submission.

While Officer Ravadge had some physical and verbal contact with the arrestees, this

contact did not constitute an arrest.  The Plaintiffs have offered no evidence to suggest that

Officer Ravadge arrived on the scene before the protestors submitted to their arrest.  In support

of their position, Plaintiffs rely on Officer Ravadge's deposition testimony that he handcuffed

five or six arrestees and searched six or seven male arrestees.  However, not a single Plaintiff

claims to have been handcuffed by Officer Ravadge, and no male Plaintiff claims to have been

searched by Officer Ravadge prior to being loaded into the van.  As only nine of the eighteen

---

[12]  Neighoff also attempted to clarify the role of the Bel Air Police Officers in his deposition.
**[Counsel for Plaintiff] Q**:
    Call your attention to paragraph 18, of your declaration.
    And I'm quoting – several other troopers also arrived as well as officers from the Bel Air Police
Department, and deputies from Harford County Sheriff's Office.
    Together, we placed most of the protestors under arrest
    By we, do you mean officers from the Bel Air Police Department, and deputies from Harford County, as
well as troopers?
**A**:
    By the way it's word [sic], I would say yes.  But that's not - - the decision for the arrest was made by me,
on the scene
**Q**:
    I - - I know, but I'm asking you about the physical arrest.
    Would it be fair to say that the physical arrest was conducted by a group of law enforcement officers,
including troopers, Bel Air Police Department officers, and deputies from the Harford County Sheriff's office?
. . . .
**A**:
    No.  I understand how it's written, but, no.  They assisted.  They didn't arrest anyone.
**Q**:
    Well, did they physically assist in placing people into custody, whether or not you would call it an arrest?
**A**:
    They - - some may have put Flex cuffs on.
(Neighoff Dep. 157:8-158:20.)

arrestees are plaintiffs in this consolidated action, the Plaintiffs have not offered sufficient evidence to sustain a claim that Officer Ravadge actually arrested any of the current Plaintiffs in this matter.

The Plaintiffs, however, have presented two related theories that could impose liability on the Bel Air Defendants based on their mere presence at the scene of the Plaintiffs' arrest. The Plaintiffs first argue that the Bel Air Defendants were "integral participants" in the arrest because they contributed a "show of force" at the scene. Alternatively, the Plaintiffs assert that the Bel Air Defendants are liable under a theory of "bystander liability." This Court will address each theory in turn.

### B. Integral Participant Theory

The Plaintiffs assert that "[p]olice officers can be held liable for their 'integral participation' in constitutional torts committed by other officers, which theory 'does not require that each officer's actions themselves rise to the level of a constitutional violation.'" (Pls.' Opp'n 15, ECF No. 192-1) (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)). Under this theory, they argue, "officers who merely provide an armed presence while others commit the constitutional violation are 'integral participants' in the violation." (Pls.' Opp'n 15) (citing, *inter alia*, *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir.1982)).

The Plaintiffs' theory fails. First, the Plaintiffs have failed to cite any case that makes the "integral participant" theory binding on this Court.[13] Second, the cases that Plaintiffs do cite are clearly distinguishable.

---

[13]  Arguably, this Court has already rejected theories that would find back-up officers personally liable in such situations. See *Claiborne v. Cahalen*, 636 F. Supp. 1271, 1277 (D. Md. 1986) (". . . Bailey and Klocko did not take any actions which were the proximate cause of Claiborne's alleged injuries. Their answers to plaintiff's interrogatories reveal that they did not play any part in Claiborne's arrest save for arriving on the scene as back-up units. Plaintiff has failed to demonstrate that an issue of fact remains for trial as to the personal liability of Bailiey and Klocko.").

Plaintiffs primarily rely on *Gagnon v. Ball*, which involved an officer who personally observed the events leading up to the plaintiff's unconstitutional arrest. [14] But in *Gagnon* and the other cases cited by the Plaintiffs,[15] the integral participants all arrived with the primary officers and provided the show of force *at the time* that the arrestee "submit[tted] to the assertion of authority." *California v. Hodari D.,* 499 U.S. 621, 626 (1991). This distinction is a logical necessity. An "Integral Participant's" liability is premised on the notion that he provides an "assertion of authority" to which the arrestee submits.

Here, the Plaintiffs were already arrested and gathered by the guardrail when the Bel Air Defendants arrived. Although the Bel Air Defendants' presence may have contributed a "show of force," it was made after the plaintiffs had already submitted and is therefore irrelevant to the integral participant analysis. Thus, the integral participant theory is inapplicable under these circumstances.[16] While the parties have characterized the Bel Air Defendants involvement as

---

[14] The plaintiff, Mrs. Gagnon, had been an outspoken critic of the police department. *Gagnon*, 696 F.2d at 19. On the night in question, she had approached two police officers while frantically waving a pellet gun. *Id.* She requested that the officers pursue a car driven by a man whom she alleged had attempted to rape her. *Id.* In response, Officer Ball exited his vehicle and, without investigating her allegations of rape, immediately placed Mrs. Gagnon under arrest. *Id.* She was brought to the police station, detained, and charged with breach of the peace and carrying a dangerous weapon. *Id.* Over a year later, the charges were dropped. *Id.* Thereafter, Mrs. Gagnon sued Officer Ball, the primary arresting officer, *and* Officer Laplaca, the assisting officer who had observed this entire exchange and had "conceded that he observed the fleeing car at which Mrs. Gagnon was pointing and that he understood Mrs. Gagnon to be requesting help." *Id.* at 20. Ultimately, the Second Circuit found Officer Laplaca liable to Mrs. Gagnon because he "not only declined to intercede on Mrs. Gagnon's behalf but also assisted Officer Ball in detaining her." *Id.* at 21.

[15] The two other cases discussed by Plaintiffs in detail are *James v. Sadler* and *Melear v. Spears*. In *James v. Sadler*, 909 F.2d 834 (5th Cir. 1990), Yazoo City officers accompanied the Narcotics Bureau agents to a salon operated by a suspected drug trafficker. The Yazoo City officers participated in the entrance of the salon and then also guarded and detained the salon's occupants after that initial entrance. Thus, the officers were involved at every step of the process.
   *Melear v. Spears*, 862 F.2d 1177 ( Cir. 1989), is similar. In *Melear*, a group of off-duty officials (several of whom had been drinking) illegally searched an apartment. One participant remained at the door as backup while the other members of the group searched the apartment after kicking in the door. The Court held that the back-up officer was liable for the unconstitutional search along with the other defendants because he "performed police functions that were integral to the search." *Melear*, 862 F.2d at 1186.

[16] Without ruling further on the issue, this Court notes that the Plaintiffs' analogy to integral participant cases is unpersuasive. While the cited cases did find liability for back-up officers, none established a hard-line rule that

12

providing assistance in the arrest of the plaintiffs, their conduct is perhaps more properly characterized as providing assistance in the processing and transporting of the already arrested Plaintiffs.

### C. Bystander Liability Theory

Alternatively, the Plaintiffs contend that the Bel Air Defendants are liable as bystanders. The theory of bystander liability "is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 203 (4th Cir. 2002). Accordingly, law enforcement officers have "*an affirmative duty to intervene* to protect the constitutional rights of citizens from infringement by other law enforcement officers." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (emphasis added). Plaintiffs assert that the Bel Air Defendants stood by while the Maryland State Troopers violated their First and Fourth Amendment rights.

### 1. The Limitations of Bystander Liability

The Fourth Circuit has held that "an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall*, 302 F.3d at 204. In a footnote, the Fourth Circuit emphasized the importance of the knowledge requirement:

---

back-up officers are always liable. Moreover, the Plaintiffs make no attempt to establish elements of the theory. But a careful reading of the cases suggests that the back-up officer must know of the violation before liability is established: in the Plaintiffs' cases, the back-up officer had accompanied the primary officer and was privy to the same set of facts. *See, e.g.*, *Gagnon v. Ball*, 696 F.2d at 19, 21. However, this Court refrains from making any rulings regarding the elements of an "integral participant" theory as the parties have offered no binding authority on the issue, and the theory, to the extent it is binding, clearly does not apply in this case.

> Although some of our sister Circuits have employed slightly different formulations of the knowledge prong, this requirement has substantively been the same: namely, that a bystanding officer must know of his fellow officer's misconduct. The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. If the bystander lacks such *specific knowledge*, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible.

*Randall v. Prince George's County, Md.*, 302 F.3d 188, 204 n.24 (4th Cir. 2002) (emphasis added).[17]

However, bystander liability is a carefully circumscribed doctrine and is not appropriate in every factual scenario. In fact, the Fourth Circuit has explicitly stated that bystander liability is only appropriate in "certain limited circumstances," *Randall*, 302 F.3d at 204, although the Court declined to fashion a hard-line rule restricting the theory only to excessive force cases. *Randall*, 302 F.3d at 204 n.23 (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)) ("Although bystander liability decisions have usually involved excessive force claims, use of the bystander liability theory has not been so limited."). The Fourth Circuit provided no further guidance regarding the limitations of the doctrine, but a review of the case law demonstrates that these "limited circumstances" generally involve clearly egregious behavior or police misconduct. *Compare Randall*, 302 F.3d 188 (bystander liability unsuccessfully invoked where plaintiffs were detained for several hours even after suspect was identified and apprehended), *and Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001) (bystander liability unsuccessfully invoked where plaintiffs alleged racial profiling in operation of drug trafficking prevention program); *with Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) (finding bystander liability when

---

[17] Notably, the Fourth Circuit made no mention of what the officers in *Randall* should have known. Instead, the Court focused strictly on what the agents knew at the time. *See Randall*, 302 F.3d at 205.

officers stood by while other officers pulled down the plaintiff – an anti-war demonstrator who was having an asthma attack – and dragged him down the street.)[18]

## 2. Bystander Liability Is Inapplicable in this Case

Here, a finding of liability against the Bel Air Defendants would require this Court to extend the doctrine beyond its traditional "limited circumstances." The Plaintiffs assert that the Bel Air Defendants participated in an "arrest that clearly violated constitutional rights" but have not offered adequate proof to support this legal conclusion. In this regard, the Plaintiffs conflate the knowledge available to the Maryland State Troopers to the Bel Air police officers. The Maryland State Troopers and the Bel Air Defendants engaged in very different conduct in the arrest of the Plaintiffs. The Bel Air Defendants simply assisted the Maryland State Troopers in securing arrestees. At no point did the Bel Air Defendants observe conduct that constituted a clear violation of a constitutional right. *See, e.g.*, *Lykken v. Vavreck*, 366 F.Supp. 585, 599 (D.C. Minn. 1973) (finding no liability for secondary officers because the directions given to them "were not clearly illegal" under the circumstances as described to those officers).

Certainly, neither Deputy Chief Dupre nor Corporal Zulauf had any indication that the Troopers conduct was "clearly illegal." When they arrived at the scene, Dupre and Zulauf found the Plaintiffs sitting along the guardrail. While at the scene, they watched the Troopers handcuff arrestees, briefly search them, and load them into a van for transport to the Barracks. Without

---

[18] The Plaintiffs also cite *Yang v. Hardin*, 37 F. 3d 282 (7th Cir. 1994). In *Yang*, Officers Brown and Hardin arrived at plaintiff's store to investigate a burglary. When the officers went to leave, the plaintiff noticed a bulge in Officer Brown's jacket. After an angry confrontation, Officer Brown pulled merchandise from his jacket, threw it at the plaintiff, and returned to the squad car with Officer Hardin. The plaintiff requested that Officer Hardin contact his supervisor and held onto Officer Brown's open car door in an attempt to prevent the officers from leaving. Officer Brown started the car and began to drive away. When the plaintiff did not let go of the door, Officer Brown began to drive in an erratic fashion in an attempt to shake the plaintiff loose from the door (while also repeatedly striking the plaintiff in the ribs with his elbow). Despite this egregious conduct, the actual basis for the Seventh Circuit's finding of liability was based on the fact that Officer Hardin had defaulted in the civil action and had not entered any evidence to refute the plaintiff's claim.

knowledge of the underlying events leading up to the arrest, there was no way for either Dupre or Zulauf to assess the constitutionality of the arrest. Because the Plaintiffs had already been arrested and shepherded to the guardrail, the Bel Air Defendants were unlikely to see any sort of illegal conduct when they arrived.

The Plaintiffs rely on the fact that previous protestors (whether associated with Defend Life or other organizations) had not been arrested. But this fact is not dispositive; as far as Deputy Chief Dupre and Colonel Zulauf knew, there was a valid reason for the arrest. Indeed, nothing they saw clearly and unequivocally demonstrated that the Troopers had acted without probable cause.[19]

Officer Ravadge's experience was no different, with one exception: upon arrival, Officer Ravadge was told by Trooper Neighoff that the reason for arrest was failure to obey an order to "leave the area" because of "not having a permit." (Pls.' Opp'n ¶ 55). However, the Plaintiffs fail to establish that Officer Ravadge knew that no such permit requirement existed.[20] As such, the Plaintiffs fail to show that Officer Ravadge knew that the Plaintiffs were being arrested without probable cause.

Thus, the issue of the Bel Air Defendants' bystander liability fails the first prong of the three-part test. The facts, construed in the light most favorable to the Plaintiffs, do not support the contention that the Bel Air Defendants knew (or even should have known) that the Troopers had violated the Plaintiffs' Fourth Amendment rights.

---

[19] The Plaintiffs' suggest that the Bel Air Defendants "had reason to know" that a constitutional violation was occurring because none of the Bel Air Defendants saw illegal conduct at the scene when they arrived. This argument is illogical and, therefore, unavailing. Considering the Troopers had already gathered the protestors on the guardrail, the officers should not have expected to see continued illegal conduct.

[20] In light of the lack of clear precedent, this Court declines to apply a "should have known" standard. Even if such a standard were to be applied, however, Officer Ravadge is shielded by qualified immunity. *See infra*, Part II.

Nor have the Plaintiffs established that the Bel Air Defendants are liable as bystanders to a First Amendment violation. The Troopers gave no indication to the Bel Air Defendants that the Plaintiffs' First Amendment-protected activity played any part in the arrest. While the Bel Air Defendants knew they were dealing *with protestors*, there is no evidence to suggest that they thought the Plaintiffs were arrested *because they were protestors*. Even if the Plaintiffs succeed on their First Amendment claims against the Maryland State Troopers, the Plaintiffs may not conflate the knowledge and motives of the Troopers with those of the Bel Air Defendants. As such, a reasonable jury would have no basis to find that the Bel Air Defendants had knowledge that they were observing another officer's illegal act. Accordingly, Plaintiffs' First Amendment bystander liability claim fails.

## II. Qualified Immunity

Even if the Plaintiffs were able to show that the Bel Air Defendants were liable under an integral participation or bystander liability theory, their claim would nevertheless fail as the Bel Air Defendants' conduct is shielded by qualified immunity. Government officials are generally protected by qualified immunity when they perform the discretionary duties of their offices. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The affirmative defense of qualified immunity shields an officer from monetary damages as long as his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*

Courts have traditionally engaged in a two-step analysis when determining whether an officer is protected by qualified immunity. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). First, a court determines whether a constitutional right has been violated. Second, "assuming that the violation of the right is established, courts must consider whether the right was clearly

established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The United States Supreme Court has recently modified this rigid, two-tiered approach, by allowing reviewing judges to evaluate the two factors in whatever order they wish, in view of the unique facts of a case.  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) ("The judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Under normal circumstances, when a court reaches the question whether reasonable officers would have realized that their conduct violated individual rights, the defense of qualified immunity "ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."  *Trulock v. Freeh*, 275 F.3d 391, 400 (4th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, (1982)).  However, the Supreme Court has also recognized that, in "extraordinary circumstances," police officers may be immune to suit even if they act in act in violation of clearly established law.  *Harlow*, 457 U.S at 819.

Assuming, *arguendo*, that the Maryland State Troopers unconstitutionally violated the Plaintiffs' First and Fourth Amendment rights, the question becomes whether the Bel Air Defendants will be denied the protection of qualified immunity due to their minimal participation in the arrest of the Plaintiffs.  The Plaintiffs argue that qualified immunity should be denied because of the rule that "a reasonably competent public official should know the law governing his conduct." (Pls.' Opp'n 31) (quoting *Trulock v. Freeh*, 275 F.3d 391, 400 (4th Cir. 2001)). Under these circumstances, however, the Plaintiff's reliance on *Trulock* is misplaced.

Here, three Bel Air police officers arrived at the scene of an arrest. The officers observed the arrestees seated along a guardrail. Two of the officers (Deputy Chief Dupree and Colonel Zulauf) remained removed from the scene and were provided with no further material details about the arrest.[21] Officer Ravadge was informed that the reason for [the protestors'] arrest was failure to obey an order to 'leave the area' because of 'not having a permit.'" (Pls.' Opp'n 10.) Officer Ravadge then handcuffed a few of the arrestees, searched a few of the arrestees in preparation for transport, and transported one arrestee to the Maryland State Trooper barracks.

## A. Deputy Chief Dupre and Colonel Zulauf

Deputy Chief Dupre and Corporal Zulauf are both entitled to qualified immunity because nothing that the Maryland State Police did *while Dupre and Zulauf were present* would have alerted those officers that a constitutional violation was occurring. As neither officer was "required to independently determine that probable cause exists," *Stearns*, 615 F.3d at 1286, a reasonable police officer in the position of either Deputy Chief Dupre or Colonel Zulauf would not have realized that his actions – simply standing and observing the arrest of the protestors – violated the Plaintiffs' constitutional rights.[22] Accordingly, both Dupre and Zulauf are entitled to qualified immunity.

## B. Officer Ravadge

The question of Officer Ravadge's immunity presents a slightly more nuanced question.

---

[21] Colonel Zulauf never spoke with any of the troopers and had no way of knowing that the arrest was in any way illegal. Similarly, Deputy Chief Dupre only knew that the Troopers had "addressed" the arrestees "at a prior location" without any further clarifying details.

[22] This Court rules here in regards to both the First and Fourth Amendment claims. Cf. *Collinson v. Gott*, 895 F.2d 994, 997 (4th Cir. 1990) (per curiam) (granting qualified immunity to officers who, acting on the orders of the president of a board of county commissioners, removed individual from a public meeting based on his comments); *Id.* at 1004-05 (Phillips, J., concurring); see also *Rauen v. City of Miami*, 06-21182-CIV, 2007 WL 686609 (S.D. Fla. Mar. 2, 2007) ("[The Court] need not decide this issue because the dearth of case law on this issue, and the lack of any U.S. Supreme Court, Eleventh Circuit, or Florida Supreme Court case finding liability for failure to intervene to prevent violations of the First Amendment, evidence a lack of clearly established law that entitles each Individual Defendant to qualified immunity with respect to Counts Fifteen, Seventeen, and Nineteen of the TAC.").

The Plaintiffs argue that Officer Ravadge knew or should have known that the Plaintiffs' arrest was illegal because he should have known that 1) no permit requirement existed and 2) the Maryland State Troopers therefore lacked probable cause to arrest the Plaintiffs. Under the circumstances of this case, however, this argument must fail.

The denial of qualified immunity for Officer Ravadge would mean that an assisting officer must assess both the primary rationale for probable cause *and* the factual and legal rationale that support it. This Court has previously rejected this proposition. *See Carter v. Jess,* 179 F. Supp. 2d 534, 544 (D. Md. 2001) ("Plaintiff has cited no authority for the proposition that an officer must make an independent assessment of probable cause before assisting other officers with what appears to be a difficult or potentially dangerous arrest that is already underway. Indeed, such a requirement could yield perilous results for officers whose colleagues are deterred from assisting them."); *see also Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir. 2010) ("When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists."); *Orin v. Barclay*, 272 F.3d 1207, 1216-17 (9th Cir. 2001).

In fact, other courts have held that assisting officers are not automatically liable for the mistakes of the primary officer even if those mistakes are mistakes of law. *Liu v. Phillips*, 234 F.3d 55 (1st Cir. 2000) (noting that an officer is immune from suit when "the agent who directs or authorizes the arrest has made a mistake of law . . . invisible to the assisting officer"); *see also Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary

legal justification for his actions exists (*e.g.* a warrant, probable cause, exigent circumstances"); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1348-49 (7th Cir. 1985) (suggesting that "extraordinary circumstances" might exist where officers acted upon instructions from superior officers who were removed from the scene but seemingly made the decision to arrest).

A reasonable officer in Officer Ravadge's position would have provided assistance under these circumstances because Trooper Neighoff's statements were not sufficient to make a reasonable officer realize that his conduct violated clearly established law.[23]  First, the reason stated for the arrest itself was plausible and had appropriate legal basis.[24]  Moreover, a reasonable police officer would not have questioned an order to "leave the area."  Such an order could easily and reasonably be interpreted as meaning "leave the area of the intersection."[25] Accordingly, Trooper Neighoff's description of the order gave no indication that a clear violation of the First Amendment had occurred; such an order could certainly be content neutral and narrowly tailored while also leaving open reasonable alternatives.

Trooper Neighoff's reference to the permit requirement, on the other hand, was of secondary importance to an assisting officer.  An assisting officer would only be concerned with the rationale for the arrest itself; he would not anticipate that he would be held responsible for the mistakes of law enforcement agents that had previously occurred and in which he had not participated.  Moreover, when coupled with two statements that were reasonable and supported

---

[23]  Trooper Neighoff's statements are best viewed as relaying three distinct pieces of information.  First, he provided the reason for arrest: failure to obey a police order.  Second, he described the original order given to the protestors: "leave the area."  Lastly, Trooper Neighoff explained the justification for the dispersal order: failure to obtain a permit.

[24]  Title 10, section 201(c)(3) of the Criminal Article of the Maryland Code prohibits individuals from disobeying lawful and reasonable police orders: "A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace."  MD Code Ann. CR 10-201(c)(3).

[25]  For the purposes of the Bel Air Defendants' liability, it is what the Bel Air Defendants were told – and not what was actually said at the intersection of Routes 24 and 924 – that is relevant.

by existing law, Trooper Neighoff's mistake of law would certainly sound reasonable to an officer who heard his explanation of the situation. While Officer Ravadge was not aware of an ordinance requiring a permit, Officer Ravadge was in the field and had no opportunity to check Trooper Neighoff's understanding of the law. In addition, this misstatement of the law was made by a member of the Maryland State Police. Trooper Neighoff's statements were not clearly illegal, and, as such, a reasonable police officer would not have realized that the arrest of the Plaintiffs had been or could have been illegal.

For the above reasons, this court holds that a reasonable assisting officer would have acted as Officer Ravadge did, and, therefore, Officer Ravadge is entitled to qualified immunity even if otherwise liable under Plaintiffs' other theories of liability.

### III. Claims Under Maryland Declaration of Rights

In addition to Plaintiffs' federal claims, Plaintiffs assert claims under the Maryland Declaration of Rights. Because Plaintiff's federal claims must be dismissed, this Court must determine whether to retain supplemental jurisdiction over the pendent state law claim. *See* 28 U.S.C. § 1367(c)(3). In addressing this issue, the Supreme Court has advised that "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988) (citation omitted). The Court of Appeals of Maryland has "often commented that . . . state constitutional provisions are *in pari materia* with their federal counterparts." *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 805 A.2d 1061, 1071 (Md. 2002); *see also Miller v.*

*Prince George's County*, 475 F.3d 621, 631 n.5 (4th Cir. 2007). As such, the same analysis applies to the Plaintiffs' corresponding state constitutional claims and in the interests of judicial economy, fairness, and convenience, this Court will address the Plaintiffs' pendant state-law claims.

This Court has noted that the only "major distinction between the state constitutional claims and the federal claims is that Maryland does not recognize the defense of qualified immunity for officials committing state constitutional violations." *Walker v. Prince George's County*, No. AW-07-123, 2008 WL 7555247, at *5 (D. Md. March 31, 2008) (citing *Miller*, 475 F.3d at 631). However, even setting aside the unavailability of qualified immunity, the Plaintiffs have failed to establish that the Bel Air Defendants violated the Plaintiffs' federal or state constitutional rights. Not only did the Bel Air Defendants not actually arrest the Plaintiffs, but the Plaintiffs' other theories on which they seek to impose liability—namely, integral participant theory, and bystander liability theory—are no sounder in the context of state constitutional violations than they are in the context of federal constitutional violations. Put simply, Plaintiffs have not put forward any evidence that would impose liability on the Bel Air Defendants as separate entities from the Maryland State Police Defendants. The knowledge and actions of the Maryland State Police may not be attributed to the Bel Air Defendants in their back-up capacity, and as a result, the Bel Air Defendants are entitled to summary judgment on Plaintiffs' state law claims.

<u>CONCLUSION</u>

For the reasons stated above, the Bel Air Defendants' Motion for Summary Judgment (ECF No. 189) is granted, and the Plaintiffs' Cross-Motions for Summary Judgment (ECF Nos. 191 and 192) are denied.

A separate Order follows.

Dated: July 5, 2011                                          /s/_____
                                                             Richard D. Bennett
                                                             United States District Judge