IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| ANGELA SWAGLER, *et al.* | * |
| Plaintiffs, | * |
|  | *      Civil Action No.: RDB-08-2289 |
| v. | * |
| COLONEL TERRENCE SHERIDAN, *et al.*, | * |
| Defendants. | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

On September 3, 2008, Plaintiffs Angela Swagler and Elizabeth Walsh (the "Swagler Plaintiffs") filed the present action asserting numerous constitutional and common law claims relating to a dispersal order, and subsequent arrest, search, and detainment that occurred after the Plaintiffs participated in a pro life demonstration on August 1, 2008, in Harford County Maryland. The named Defendants in that case include Terrence Sheridan, Charles Neighoff, Dona Bohlen, Walter Rasinski, and Christopher Bradley, all current or former employees of the Maryland State Police. A companion case, filed on July 23, 2009, by fellow demonstrators Jack Ames, Laura Beeson, Nathan Cain, Patrick Mooney, Albert Stecklein III, Timothy Sullivan, Jessica Ward, and Defend Life, Inc., (the "Ames Plaintiffs") asserts similar claims against the same defendants, with the addition of Charles Mohr, Ernest Meads, and Mitchell Nuzzo (collectively, "Defendants"). By Order of February 4, 2010, this

Court consolidated the two cases pursuant to Federal Rule of Civil Procedure 42. *See* Feb. 4, 2010 Order, ECF No. 140.[1]

On June 16, 2011, this Court heard oral argument on the Defendants' Motion for Summary Judgment, the Swagler Plaintiffs' Cross-Motion for Summary Judgment, the Ames Plaintiffs' Cross-Motion for Summary Judgment, the Swagler Plaintiffs Motion for Summary Judgment against only Defendant Bohlen, and the Ames Plaintiffs Motion for Summary Judgment against Defendant Bohlen. For the reasons set forth below, the Defendants' Motion for Summary Judgment (ECF No. 190) is granted in part and denied in part, the Swagler Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 193) is granted, the Ames Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 198) is granted in part and denied in part, the Swagler Plaintiffs' Motion for Summary Judgment against Defendant Bohlen (ECF No. 195) is granted in part and denied in part, and the Ames Plaintiffs' Motion for Summary Judgment against Defendant Bohlen (ECF NO. 199) is similarly granted in part and denied in part.

## BACKGROUND AND PROCEDURAL HISTORY

On June 29, 2009, this Court issued a Memorandum Opinion and Order granting in part and denying in part several dispositive motions submitted by the originally named defendants against the Swagler Plaintiffs. *See Swagler v. Harford County*, No. 08-2289, 2009

---

[1] This Court recently granted summary judgment to a second group of defendants—namely, defendants from the Bel Air Police Department. *See* Memorandum Opinion and Order of July 5, 2011, ECF Nos. 233 and 234. This opinion concerns only those defendants affiliated with the Maryland State Police.

WL 1575326 (D. Md. June 29, 2009), ECF No. 86.[2]   At that stage in the litigation, the

Defendants moved to dismiss, or, in the alternative, for summary judgment, as to all federal

claims asserted against them in their individual capacities under the doctrine of qualified

immunity.   This Court determined that the Defendants' request for qualified immunity was

"premature . . . due to the undeveloped nature of the record" and that the Plaintiffs

"deserve[d] an opportunity to conduct a thorough discovery."   *Id.* at 12.   The Defendants

brought an interlocutory appeal from this Court's denial of qualified immunity.   The United

States Court of Appeals for the Fourth Circuit affirmed this Court's denial of qualified

immunity as premature with regard to Plaintiffs' First and Fourth Amendment claims, but

reversed in part, concluding that the Plaintiffs' constitutional due process claims failed as a

matter of law.   *See Swagler v. Neighoff*, 398 F.App'x 872, 878 (4th Cir. 2010) (unpublished).   In

addition, this Court has issued numerous other opinions in this case touching on discrete

issues, but all involving the same underlying facts.   *See, e.g.*, ECF Nos. 114, 117, 150, 155, and

164.   Discovery has now concluded, and the Defendants have renewed their motion for

summary judgment, largely on qualified immunity grounds.   Both the Swagler Plaintiffs and

the Ames Plaintiffs have cross-moved for summary judgment on their First and Fourth

Amendment claims.

　　　As a result, the factual background of this case has been fully developed and it will

not be completely reiterated here.   Instead, this Court will briefly summarize only the facts

necessary to decide the presently pending cross-motions for summary judgment.

---

[2]  In light of the fact that Harford County and the Plaintiffs have reached a settlement in this matter, this Court re-captioned this case during the hearing conducted on June 16, 2011 to reflect the fact that Harford County is no longer a party to this litigation.  *See* Order of June 27, 2011, ECF No. 232.

The Consolidated Plaintiffs were participants and organizers of the 2008 Face the Truth Tour (the "Tour"), a week-long demonstration event sponsored by Defend Life, Inc., a non-profit pro-life advocacy group. The Tour's purpose was to communicate "the reality of what abortion is." Walsh Dep. 58, ECF No. 193-2. As part of their demonstration, Tour members stood along Maryland roads holding signs depicting their version of the "reality" of abortion. Specifically, Tour members held large signs depicting healthy babies and contrasted those signs with others depicting the results of abortions. The Tour members also held signs containing an image of Jesus Christ with the words "Jesus Forgives and Heals." *See* Swagler Plaintiffs Mot. Summ. J. Exs. 4(a)-(d), ECF Nos. 193-5-8. The signs depicting the results of abortion contained a graphic image of an aborted fetus known throughout the pro-life movement as "Baby Malachi." *See Swagler*, 398 F.App'x at 875 n.1 (citations omitted).

On August 1, 2008, the final day of the Tour, the Consolidated Plaintiffs and other Tour participants staged a pro-life protest on a grassy shoulder along Route 24, near the intersection of Routes 24 and 924 in Harford County, Maryland. That particular location was chosen by the Tour because it received steady traffic flow, and was similar to locations where the Tour had previously staged successful demonstrations. *See* Ames Dep. 9, 68, ECF No. 193-4; Walsh Dep. 41. In fact, as evidenced by the testimony of various Maryland State Police ("MSP") and Harford County Sheriff's Office employees, including some of the defendants in this case, that general location on Route 24 is a popular destination for varying types of demonstrators, political groups, and commercial advertisers to express their respective messages—and people wielding signs near Route 24 have been observed

hundreds of times.  *See, e.g.*, Mina Dep. 34-38, ECF No. 193-9; Bradley Dep. 135-36, ECF No. 193-10; Meades Dep. 37-38, ECF No. 193-11.  The Defendants in this case, and other Maryland law enforcement officers all testified that, other than the Consolidated Plaintiffs in this case and other Tour members who participated in the August 1, 2008 demonstration, no persons or groups of persons had ever been arrested or ordered to disperse as a result of their expressive activities along Route 24.  *See* Meades Dep. 20; Mina Dep. 36-38; Dupre Dep. 11-12, ECF No. 193-14; Ravadge Dep. 10-12, 15-16, 18, ECF No. 193-15.  Moreover, the Face the Truth Tour, including many of the same demonstrators, had previously held the same or similar signs along Route 24 in the seven years leading up to 2008.  Ames Dep. 9, 68, 73-74; Walsh Dep. 55.  In fact, the Maryland State Police were aware of the Tour's previous demonstrations, and in some cases, conducted surveillance on the group, and observed the actual demonstrations.  *See, e.g.*, Ames Dep. 68-69 (during the 2007 Tour, demonstrators observed MSP Troopers monitoring the demonstration from a parked police cruiser); MSP Surveillance Docs., ECF No. 193-51 (At least in 2005 and 2007, the MSP conducted and documented threat assessments regarding the Face the Truth Tours, ultimately concluding that the group did not pose a high security threat, and the Tour's activities were protected by the First Amendment to the United States Constitution.).

Regardless of the Tour's successful demonstrations in prior years, on August 1, 2008, shortly after the Tour began their demonstration, motorists driving on Route 24 began making calls to the MSP Barrack in Harford County Maryland.  The United States Court of Appeals for the Fourth Circuit characterized the calls as follows: "The content of the

recorded[3] calls reflect that the callers expressed two sentiments: (1) disapproval of the public display of images of dismembered fetuses and (2) concern about the impact of the images on their own ability and that of others to drive safely." *Swagler*, 398 F.App'x at 875. Perhaps unsurprisingly, the parties emphasize different aspects of the calls—the Plaintiffs emphasize the complaints regarding the *content* of the Tour's signs, *see, e.g.*, Swagler Pls.' Mot. Summ. J. 6, and the Defendants emphasize the calls that complain or make reference to the signs' *effect on traffic*, *see, e.g.*, Defs.' Mot. Summ. J. at 4-5.. While some of the recorded calls reference traffic concerns, it is clear that the overwhelming sentiment of the callers relates to their offense or disapproval of the *content* of the Tour's signs depicting aborted fetuses.[4]

---

[3] Due to the large number of calls received by the law enforcement agencies, not all of the calls were recorded because the volume of calls overwhelmed the recording capacity of the recording equipment. Of the approximately twenty calls that the Maryland State Police Barrack received, only nine were recorded.

[4] *See* MSP Call Record, ECF No. 193-21. For example:
**Caller One**: "Like I'm in the car with my newborn and it[']s like I had to pull over because I'm crying . . . . It[']s extremely inappropriate like I understand everyone's right to like their opinion and I understand that and I agree with it but that stuff is just like really inappropriate . . . . If you happen to go over there you would be absolutely appalled. . . . I don't think that anyone should have to see that and you know [ ] it[']s just disgusting to me and I can[']t believe that someone would go and put those up like that for people to see. It[']s absolutely awful you know?"
**Caller Two: "**They got these huge graphic pictures of dead babies. . . . I was just concerned about kids riding by and seeing that you know[?]"
**Caller Three**: "I'm just calling to complain about the protestors on 24. The pictures are offensive and I don't think they should be allowed to show them."
**Caller Four**: "Yeah, I need to file a complaint. They have abortion people out on 924 and 24 by the Walmart with very gruesome signs of dead children, and I have children in my car and it's very offensive."
**Caller Five**: "I had gotten off on 24 and there are people standing there with signs [ ] of aborted babies and it[']s quite [ ] disturbing. And I almost got into an accident because of it."
**Caller Six**: "[H]as anybody complained about the abortion activists [on Route 24]? [Trooper response indicating police presence] Oh thank goodness, [be]cause that was the grossest most disgusting thing I've ever seen. And not only that. People almost had accidents looking at that."
**Call Seven**: "[Sgt. Bohlen:] are [the protesters ] interfering with traffic too? [Caller Seven]: Yes, because everyone [is] drawing attention to these pictures of these dead children here."

It was these calls that prompted the Maryland State Police into action. *See, e.g.,* Neighoff Dep. 333-34; Bohlen Dep. 109-110. Sergeant Bohlen, the MSP duty officer, dispatched Troopers Neighoff, Bradley, and Rasinski in order to "confirm that [the Tour] have a permit to be there," and explained that "it's disturbing billboards that they are carrying. That's why it's causing a traffic hazard." MSP Transmission 9, ECF No. 193-24; *see also* Bohlen Dep. 144. Trooper Bradley was the first to arrive. Notably, virtually the entirety of the confrontation between Trooper Bradley and the Plaintiffs was captured on video by one of the Tour demonstrators,[5] and aspects of that confrontation will be summarized here. *See* Video of Dispersal Order ("Tour Video"), Swagler Pls.' Mot. Summ. J., Ex.25. After seeking out the person in charge, Trooper Bradley asked Ms. Walsh if the Tour had a permit to demonstrate. Trooper Bradley indicated that a Harford County Ordinance required a permit for the type of demonstration the Plaintiffs were engaged in. When Ms. Walsh indicated that she did not have a permit, Trooper Bradley said "you need to pack up and go or you're going to jail, that's it." *Id.* In a notable exchange, Ms. Walsh inquired of Trooper Bradley specifically what ordinance required that the Tour have a permit to demonstrate along Route 24. Trooper Bradley responded "you need a permit. That's the

---

**Call Eight:** "I'm trying to report there's a bunch of pro-life protestors out on Route 24. I'm sure you guys are aware. [PCO Sturks:] Yeah. We actually just left there and they're not happy. And they're on [*sic*] way up to our barracks. [Caller Eight:] Oh really because they got pictures of dead babies and that's just not cool. . . . I got a pretty good look at it [be]cause I was right on the side of the road looking at them, and I was just like that's not cool. [PCO Sturks:] Yeah, it[']s not cool at all."
**Caller Nine:** "I just wanted to report there are some people along side of Route 24 . . . holding up some very inappropriate pictures of aborted fetuses."

[5] This fact was not contradicted by the Defendants at oral argument. The video is approximately five minutes long, and in addition to capturing the exchange between the Plaintiffs and Trooper Bradley, also captures some of the exchange between the Plaintiffs and Trooper Neighoff.

end of the story.  If you don't have a permit, you cannot stand here.  That's the end of it. It's not what the law is; it's what I'm telling you the law is." *Id.*

That exchange is notable because Harford County does not, in fact, have an ordinance that would require the Tour or any similar group to obtain a permit prior to staging a demonstration along Route 24, a fact not contested by the Defendants.  *See* Harford County Interrog. Resp. at 8.  Although the Maryland State Troopers had neither read, nor confirmed the existence of a Harford County Permit requirement, they nevertheless enforced it on August 1, 2008.  Specifically, the Troopers interpreted the non-existent permit requirement as closing all of Harford County, and not merely a small section of Route 24, to the Plaintiffs demonstration.  While the Defendants argue that the order given by the Troopers was simply to "leave the area," *see, e.g.*, Defs.' Reply 6, ECF No. 223, it is abundantly clear that the troopers themselves ordered the Tour members to either obtain a permit or leave Harford County.  *See, e.g.*, Mohr Dep. 41-42 (demonstrators ordered to leave "not only the area, but Harford County); Rasinski Dep. 60 ("[the demonstrators] were asked to leave the county"); Neighoff Dep. 363 ("[the demonstrators] would not be able to demonstrate in Harford County"); Bradley Dep. 84-85.  Moreover, it is clear that the dispersal order given by the Troopers was understood throughout the entire MSP Barrack as an order to leave Harford County.  *See, e.g.*, MSP Transmission;[6] MSP Statements of

---

[6] ECF No. 193-24 at 76-77 ("[The demonstrators] can sit in a cell for an hour . . . or two or three or four and rot.  When they tell—when a police officer tells them [to] leave the county, they're not kidding.  Not a joke.  And they need to understand that this is not acceptable behavior.); *id.* at 92 "We told [the demonstrators] to leave the county"); *id* at 98, 97, 137-38 (similar "leave the county" language).

probable cause;[7] and MSP Criminal Investigation Reports and supplemental reports.[8]  Only Trooper Bradley's order contemplated something other than leaving the entirety of Harford County.  Trooper Bradley undoubtedly told the Tour to "pack up and leave the county," but also told the Tour that they could continue their demonstration in the town of Bel Air, apparently on account of the fact that Bel Air has its own police department, and the Tour members would therefore no longer be under the jurisdiction of the Maryland State Police.  *See* Bradley Dep. 84-86.

Ms. Walsh and the other Tour members indicated that they believed the Troopers were infringing on their First Amendment rights of free speech, but nevertheless acquiesced to the Troopers demands and left their original demonstration location shortly after the Troopers' arrival.  The Troopers apparently believed that the Tour members were planning on visiting the police barrack in order to file a complaint.  *See* MSP Transmission 21, 30-33, ECF No. 193-24.  In this respect, and only after ordering the Tour members to leave the county, Trooper Mohr called Harford County State's Attorney Scott Lewis for guidance, specifically asking "what should we tell them when the leader comes up here to the barrack to file a complaint?"  *Id.* at 36.  Mr. Lewis replied that he did not have a copy of the Harford County code, but generally advised that the Troopers he would have to look into the issue,

---

[7]  ECF No. 193-23 at 1 ("The group leaders were told that they needed to leave and that they could not demonstrate[e] in the county without a permit.  The group leaders asked if they could go up the street and set up.  [Trooper] Rasinski advised the group leaders that they could not and had to leave the county if they wanted to demonstrate without a permit.").

[8]  ECF 193-49 at 6 ("I [Trooper Nieghoff] made contact with the group leaders and advised them they were told not to demonstrate in the county without a permit.");  Bohlen Supplemental Report, ECF No. 193-40 ("All 3 troopers told the subjects they could not demonstrate in Harford County without a permit and requested to see their permit.  The protestors could not produce a permit and were told to leave Harford County.");  Bradley Supplemental Report, ECF No. 193-50 at 3 ("I advised them to pack up and leave the county").

and would be available should the Troopers need to call him back. Notably, the Troopers had already dispersed the Tour members when Trooper Mohr first contacted Mr. Lewis, and no mention of the contours of any dispersal order was made—certainly no guidance was sought with regard to an order to leave Harford County. *See id.* at 30-39. In addition, Mr. Lewis did not authorize an arrest of the Tour members,[9] and it is clear that his advice was limited to the possibility that the Tour members were on their way to the MSP Barrack to make a complaint.

Subsequently, the Tour members set up a second demonstration approximately five miles north of their original location within the Town of Bel Air, which is a municipality within Harford County. The Tour members attempted to comply with the MSP order to leave the county, and only chose this location as a result of Trooper Bradley's erroneous guidance that the Town of Bel Air had different laws and was beyond the reach of MSP jurisdiction. *See* Walsh Dep. 79-80. In much the same fashion as the first location, the Tour members spread out along the grassy shoulder and continued their demonstration with their large pro-life signs. Motorists again began to call the MSP Barrack to complain about the content of the Tour's signs. *See* MSP Transmission 57, ECF No. 193-24. After confirming with the Troopers that the Tour had been advised to "leave and not set up again," *id.* at 59, Sergeant Bohlen dispatched Troopers Neighoff and Bradley and ordered that because "[the demonstrators] were advised to leave the county," and "[t]hey're back," "as many as you

---

[9]  In their opposition to the Plaintiffs' Motion for Summary Judgment, the MSP Defendants state that in the first call to State's Attorney Lewis "Mr. Lewis informed the Troopers that they had probable cause to arrest plaintiffs." ECF No. 208-1 at 14. This assertion is flatly at odds with the contents of the recorded call. Nowhere in that call does Mr. Lewis opine regarding probable cause to arrest the demonstrators. Mr. Lewis did state that the Troopers were "on great ground" to order the demonstrators to move, but only if the demonstrators were "out in the roadway" impeding traffic. MSP Transmission, ECF No. 193-24 at 38-39.

catch will be [arrested]." *Id.* In ordering the arrest of the Tour members, no mention was made with respect to traffic conditions, or any other criteria other than the fact that the Tour members disobeyed the Troopers' order to leave Harford County.

Troopers Neighoff, Rasinski, and Meades arrived on the scene and very quickly began arresting the demonstrators. *See, e.g.*, Rasinski Dep. 139-40. Photographs and video from the Troopers' in-car cameras depict little or no traffic back-up at this second location. *See, e.g.*, Swagler Pls.' Mot. Summ. J. Exs. 28(a)-(d) and 29(a)-(c); *see also* Arrest Video, ECF No. 47 Ex. 8. The Troopers acknowledge that they did not collect evidence relating to a traffic back-up, but did take photographs of the Tour's signs as evidence. *See, e.g.*, Zeller Dep. 127-31, ECF No. 193-43. The Troopers were directed to arrest only those demonstrators who they recognized from the first location—i.e., those demonstrators who had been witness to the Troopers' order to leave Harford County. *See* Bohlen Supp. Report at 2, ECF No. 193-40 ("There were approximately 5 or 6 individuals that were not observed at the previous location and they were told to leave the county."). The Troopers arrested eighteen Tour members over approximately one half hour.

After the arrested Tour members were transported back to the MSP Barrack, Sergeant Bohlen asked Trooper Mohr to again contact State's Attorney Lewis regarding what charges to bring against the arrestees. Mr. Lewis advised the Troopers to charge the Tour members for (1) failure to obey a lawful order under MD. CODE ANN., CRIM. LAW § 10-201(c)(2); (2) disorderly conduct under MD. CODE ANN., CRIM. LAW § 10-201(c)(3); and (3) impeding traffic under HARFORD COUNTY CODE § 193-4(B)(1).

Prior to being put in holding cells, Sergeant Bohlen conducted "secondary searches" on the female arrestees, while the male arrestees were searched by a male officer. *See* Bohlen Decl. ¶¶ 16-17. According to Sergeant Bohlen, the purpose of such a search "is to ensure that detainees do not have any objects in the cell with them that they could use to [ ] inflict self-harm," and the searches are "done on every person who is placed in a Barrack holding cell regardless of the pending charge." *Id.* at ¶ 16. These searches were performed behind the MSP Barrack. Sergeant performed the secondary searches on the female arrestees by, *inter alia*, running her fingers along the inside of their waistbands, and looking down their shirts to make sure no items were concealed in or around the arrestees bras. *Id.* at ¶ 18.

After being detained for a number of hours,[10] the Tour members were subsequently released from detention, and the State of Maryland entered a *nolle prosequi* of the charges against the Tour members.

On September 3, 2008, Plaintiffs Swagler and Walsh instituted this action alleging that the Maryland State Police violated their First and Fourth Amendment rights under the United States Constitution, as well as various complaints under Maryland state law and the Maryland Constitution. On July 23, 2009, the Ames Plaintiffs filed suit asserting similar claims. The cases were consolidated on February 4, 2010.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A

---

[10] The Tour members were not released en masse, but were released individually starting in the late evening hours of August 1, 2008.

material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

When both parties file motions for summary judgment, as here, the court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert denied*, 540 U.S. 822

(2003); *see also havePower, LLC v. Gen. Elec. Co.*, 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2720 (3d ed. 1983)).

## ANALYSIS

As previously mentioned, this case involves two groups of consolidated plaintiffs—the Swagler Plaintiffs and the Ames Plaintiffs.[11]  In nine counts, the Swagler Plaintiffs' Second Amended Complaint asserts causes of action under 42 U.S.C. § 1983 for violations of the Swagler Plaintiffs' First Amendment rights of free speech, Fourth Amendment rights to be free from unreasonable searches and seizures, and Fourteenth Amendment rights of equal protection.  In addition, the Swagler Plaintiffs assert a claim of assault and battery under Maryland law.  The Ames Plaintiffs similarly assert causes of action under section 1983 for violations of their First, Fourth, and Fourteenth Amendment rights, with the addition of a Fifth Amendment excessive force claim.  The Ames Plaintiffs assert causes of action under Maryland law for false arrest, false imprisonment, and malicious prosecution. In addition, the Ames Plaintiffs assert constitutional claims arising under the Maryland Declaration of Rights.  Both the Swagler and Ames Plaintiffs have moved for summary judgment on some, but not all of their claims.

The Swagler Plaintiffs have moved for summary judgment against Defendants Neighoff, Bradley, and Rasinski on two counts arising under the First Amendment, and one count arising under the Fourth Amendment.  ECF No. 193.  They have moved for summary

---

[11]  Collectively referred to as "Plaintiffs," unless specifically referred to.

judgment against Defendant Bohlen on the same grounds, with the addition of two Fourth Amendment claims relating to alleged unreasonable searches. ECF No. 195.

The Ames Plaintiffs have moved for summary judgment against Defendants Neighoff, Bradley, Rasinski, Meades, Mohr, and Nuzzo on two counts arising under the First Amendment, and one count arising under the Fourth Amendment. The Ames Plaintiffs also move for summary judgment on a First Amendment retaliation claim. ECF No. 198. The Ames Plaintiffs have also moved separately for summary judgment against Defendant Bohlen on the same grounds. ECF No. 199. All plaintiffs seek equitable and injunctive relief, as well as compensatory and punitive damages, and costs arising out of their First and Fourth Amendment rights.

The Maryland State Police Defendants have moved for summary judgment on all federal and state claims on the grounds that there are no issues of material fact and that the Plaintiffs have failed to establish a violation of their First and Fourth Amendment rights. ECF No. 190. The Defendants argue in the alternative that even if their actions violated the Plaintiffs constitutional rights, the individual defendants are entitled to qualified immunity because reasonable police officers, under similar circumstances, would not have known that their actions violated clearly established rights.

While the Plaintiffs characterize some facts differently than do the Defendants, they too agree that with respect to the causes of action on which the move for summary judgment, there are no genuine issues of material fact. Plaintiffs argue that the Defendants actions violated their constitutional rights to free speech and to be free from unreasonable searches and seizures. Plaintiffs argue that the Defendants are not entitled to qualified

immunity because a reasonable police officer would have known that ordering content-based suppressions of speech, and searching and seizing Plaintiffs for exercising their First Amendment rights, clearly violated Plaintiffs' constitutional rights.

As the parties' arguments overlap to a significant degree, and for the sake of clarity and brevity, the parties' claims and arguments will be discussed together in the following sections, with the understanding that each motion will be considered on its own merits.

## I. Framing the Controversy

When all is said and done, and despite the length of the background section of this Opinion and the sheer poundage of briefing this case has garnered, the facts and legal arguments of this case are relatively straightforward. The parties' interpretations of those facts, and application of legal theories, however, are not. Therefore, some clarity regarding the posture of this case and the scope of the controversy is needed.

The Defendants frame the case in the context of a police department being inundated with telephone calls regarding a pro-life demonstration conducted on a busy highway at rush hour on a Friday afternoon. The Defendants contend that in response to the numerous calls, they dispatched officers for the purpose of alleviating traffic concerns by effectuating an "impromptu dispersal order," which, they argue, is not constrained by the First Amendment to the United States Constitution. Despite the fact that the Troopers' impromptu dispersal order closed all of Harford County to the Plaintiffs' speech, the Defendants argue that "the language of the Troopers' dispersal order is immaterial. No matter what was said, plaintiffs cannot avoid the fact that there is no legal precedent that would sanction liability in these circumstances." Defs.' Opp'n at 4, ECF No. 208-1. In this

regard, the Defendants' argument is largely bereft of First Amendment analysis. Notwithstanding the fact that the impromptu dispersal order was largely based on[12] a nonexistent permit requirement, Defendants argue that they operated well within the bounds of the United States Constitution in ordering the Tour members to leave Harford County. Moreover, the Defendants contend that their actions after the initial dispersal order was given—namely ordering and effectuating the immediate arrest and subsequent searches and seizures of the Plaintiffs partly on the basis of the Plaintiffs' failure to obey a *lawful* order—does not give rise to liability because the Troopers contend they had probable cause to arrest the Plaintiffs. Defendants further argue that, should this Court conclude that their actions were violative of the Plaintiffs' constitutional rights, their actions are nevertheless cloaked in qualified immunity as a result of there being no clear precedent holding "impromptu dispersal orders" subject to First Amendment analysis.

In this regard, the Defendants place much reliance on a 2004 decision of the United States Court of Appeals for the Eighth Circuit in *Frye v. Kansas City Police Department*, 375 F.3d 785 (8th Cir. 2004). In that case, a pro-life group of plaintiffs demonstrated on the side of a road while holding signs depicting aborted fetuses. *Id.* at 788. After receiving complaints from passing motorists, the police ordered the plaintiffs to either remove their graphic signs, or move to a different section of the road. *Id.* The plaintiffs were arrested after failing to obey the police officers' order. *Id.* The Eighth Circuit concluded that,

---

[12] In framing the Defendants' argument, this Court gives deference to the parties' characterization of the evidence in this case. However, as will be discussed *infra*, the phrase "largely based on" is charitable—the record is clear that the Troopers' initial impromptu dispersal order was based almost entirely on the nonexistent permit requirement.

because the officers' regulation of the plaintiffs' speech was not motivated by the content of the signs, the order did not violate the plaintiffs' First Amendment rights as it only curtailed the time, place, and manner of the plaintiffs' speech. *Id.* at 790.

Here, the Defendants note the factually similarity between the present case and the facts presented to the court in *Frye*, and argue that the result should be the same. In this regard, the Defendants have noted, repeatedly, that the Fourth Circuit cited *Frye* in its consideration of this Court's previous denial of qualified immunity to the Defendants, even though the Fourth Circuit specifically declined to opine as to whether the outcome in this case would track that reached in *Frye*. *See Swagler v. Neighoff*, 398 F.App'x 872, 881 n.12 (4th Cir. 2010).

On the other hand, the Plaintiffs in this case embrace the holding in *Frye*. First, they argue that *Frye* is readily distinguishable in that the police officers in that case did not completely restrict the plaintiffs' First Amendment rights—they merely imposed conditions on that speech by ordering the plaintiffs to cease using the graphic signs, or move their demonstration. Second, and more importantly, the Plaintiffs embrace the Eighth Circuit's holding in *Frye* insofar as the court's analysis centered on traditional First Amendment jurisprudence.

The crux of the Plaintiffs' argument is that by closing all of Harford County to their speech on August 1, 2008, the Defendants deprived them of their constitutional rights. Unlike the Defendants, the Plaintiffs anchor their case on the so-called "impromptu dispersal order" issued by the Maryland State Police. While the Defendants attempt to cast aside the dispersal order as insignificant when compared to the ultimate arrest of the

demonstrators, the Plaintiffs argue that *but for* the unconstitutional dispersal order, the other constitutional and state law violations would not have occurred. Moreover, Plaintiffs contend that even if they had not resumed their demonstration and were not later arrested, their First Amendment claim would survive solely as a result of the unconstitutional dispersal order. Plaintiffs further argue that the Troopers' county-wide dispersal order and ensuing arrests were the direct result of passing motorists' content-based complaints aimed at the message delivered by Plaintiffs speech. In this regard, the Plaintiffs argue that the Troopers impermissibly enforced what is known as a "heckler's veto," which the Fourth Circuit has referred to as "one of the most persistent and insidious threats to first amendment rights." *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). In sum, the Plaintiffs argue that the Defendants' actions constituted a content-based restriction that was not narrowly-tailored to significant government interests, and that left open no alternative fora for Plaintiffs' protected pro-life speech.

In terms of framing the controversy, this Court agrees with the Plaintiffs' characterization of the issues. This case is primarily one concerning free speech and the First Amendment. Despite the Defendants' protestations that "there is no law that would impose liability on the Troopers for issuing an impromptu dispersal order," Defs.' Mot. Summ. J. at 32, ECF No. 190, the First Amendment to the United States Constitution guarantees the right of free speech—a right that was unquestionably restricted by the Troopers' actions on August 1, 2008.

With that in mind, this Court will first consider the Plaintiffs' free speech claims with respect to the original dispersal order. This Court will then consider the other constitutional and state law claims that flowed from that initial contact with the Maryland State Police.

## II. First Amendment Claims

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people to peacefully assemble." U.S. CONST. amend I. The Fourth Circuit has recognized that "even a minor burden on speech is sufficient to trigger a First Amendment analysis." *Am. Legion Post 7 of Durham, North Carolina v. City of Durham*, 239 F.3d 601, 606 (4th Cir. 2001) (citing *Arlington Cnty. Republican Comm. v. Arlington Cnty.*, 983 F.2d 587, 594 (4th Cir. 1993). In analyzing a First Amendment free speech claim, this Court must make three inquiries. This Court must first ascertain whether the plaintiff has engaged in protected speech. *See Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003). If the speech is protected, this Court must next determine the nature of the forum because the extent of protection afforded by the First Amendment depends on the type of forum in which the government seeks to restrict speech. *Id.* Finally, this Court "must assess whether the justifications for exclusion from the relevant forum satisfy the requisite [level of scrutiny]." *Id.*

### A. The Plaintiffs Engaged in Protected Speech

The speech engaged in by the Plaintiffs in this case—namely demonstrating their pro-life stance through posters and signs—is unquestionably protected speech, and the Defendants do not argue to the contrary. Courts, including the Fourth Circuit in this very case, have universally recognized that pro-life signs bearing images of aborted fetuses

constitutes protected speech. *See, e.g., Swagler v. Neighoff*, 398 F.App'x 872, 881 (4th Cir. 2010) (characterizing Plaintiffs' activity as "pure speech"); *United States v. Marcavage*, 609 F.3d 264, 283 (3d. Cir. 2010); *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sherriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821-22 (6th Cir. 2007). The fact that the Plaintiffs chose to speak using graphic depictions of aborted fetuses does not alter this conclusion. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Snyder v. Phelps*, ___ U.S. ___, 131 S. Ct. 1207, 1219 (2011) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989). As such, the Plaintiffs engaged in protected speech.

## B. Plaintiffs Engaged in Speech in a Traditional Public Forum

After concluding that the Plaintiffs engaged in protected speech, this Court must next determine the nature of the forum in which the government seeks to regulate speech "because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Goulart*, 345 F.3d at 246. There are four primary types of fora: traditional public fora, designated public fora, limited public fora, and nonpublic fora *See Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 383 (4th Cir. 2006). In traditional public fora and designated public fora, "the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). In limited public fora, the government can limit speech to certain groups or to certain topics so long as the government restrictions are reasonable and viewpoint neutral. *See Child Evangelism Fellowship*, 457 F.3d at 383 (citing *Good*

*News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001)). In nonpublic fora, the government may grant "selective access" through "individual non-ministerial judgments" so long as the policy is reasonable and viewpoint neutral. *Id.* (quoting *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 680 (1998)).

Here, it is clear that the relevant forum for this Court's analysis is the traditional public forum. The Plaintiffs conducted their protected speech activities on the side of a public road, Route 24 in Harford County, that, virtually every year since its existence, has been a location of choice for various demonstrations, political sign holders, and others who choose to exercise their First Amendment rights in Harford County. *See, e.g.*, Mina Dep. 34-38, ECF No. 193-9; Bradley Dep. 135-36, ECF No. 193-10; Meades Dep. 37-38, ECF No. 193-11. As the Supreme Court recently noted, a public place adjacent to a public street "occupies a 'special position in terms of First Amendment protection.'" *Snyder v. Phelps*, 131 S. Ct. at 1218 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)). Moreover, the Court has "repeatedly referred to public streets as the archetype of a traditional public forum," noting that '[t]ime out of mind' public streets and sidewalks have been used for public assembly and debate." *Snyder v. Phelps*, 131 S. Ct. at 1218 (quoting *Frisby v. Schultz*, 487 U.S. 474, 480, (1988)); *see also Perry*, 460 U.S. at 45 ("At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.") (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 (1939)); *Hill v. Colorado*, 530 U.S. 703, 715 (2000).

In this regard, it is important to note that the precise location of the Tour's protest is immaterial for the purposes of this Court's forum analysis. *See Frisby*, 487 U.S. at 481 ("No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora."). The Defendants argue that because the Plaintiffs first demonstration location, on Route 24 near the intersection of Routes 24 and 924 in Harford County, Maryland, was on a "controlled access highway," *see* Defs.' Resp. at 8-10, ECF No. 208, they were free to regulate the Plaintiffs' speech. However, this argument is a red herring because the forum analysis contemplates not only where the speech takes place, but also where the government seeks to regulate speech. *See Goulart*, 345 F.3d at 246. Here, it is abundantly clear that regardless of whether the Plaintiffs were on a controlled access highway, the "impromptu dispersal order" issued by the Maryland State Police closed all of Harford County to the Plaintiffs' demonstration. On appeal, the Fourth Circuit was unable to ascertain the contours of the "leave the county" order given by the Troopers, *See Swagler v. Neighoff*, 398 F.App'x at 875 n.2, but after discovery has taken place, there can be no doubt that the Troopers shut off all of Harford County to the Plaintiffs.[13] *See supra* at p. 8-9. Accordingly, it is clear that the Troopers sought to restrict Plaintiffs' speech in a traditional public forum.

### C. Public Forum Speech Restrictions

---

[13] For example, *see* Rasinski Dep. 60-62 ("**Q**: Were they asked to leave the scene, or were they ordered to leave the county? **A**: They were asked to leave the county. . . . **Q**: Could they have obeyed your order and gone further up the street within Harford County? . . . **A**: No, sir. . . . **Q**: Is there anywhere in the county they could have gone and obeyed your order without obtaining a permit first? . . . **A**: No, sir."); Neighoff Dep. 363-366 ("**Q**: So they couldn't have gone anywhere in Harford County? **A**: Correct.").

As previously mentioned, the level of scrutiny applied to a government's restriction on speech turns on whether the restriction is content-neutral or content-based. In traditional public fora, the government may only impose reasonable restrictions on the time, place, and manner of the protected speech. *Child Evangelism Fellowship*, 457 F.3d at 383. When these restrictions are content-neutral, intermediate scrutiny applies, and restrictions on speech are constitutional only if they are narrowly tailored to further a significant government interest, and leave open ample alternative methods of communication. *See Perry*, 460 U.S. at 45. Alternatively, when restrictions on speech are content-based, they are subject to strict scrutiny where the constitutionality of the restrictions are tested by asking whether they are necessary and narrowly tailored to achieve a compelling government interest, and were the least restrictive means of achieving that interest. *Id.*

Bearing in mind that "[d]eciding whether a particular regulation is content-based or content-neutral is not always a simple task," *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994), this Court notes that it need not actually decide whether the Troopers' impromptu dispersal order was based on the content of the Plaintiffs' message. Because of the breadth of the Troopers' order—"leave Harford County"—it can satisfy neither intermediate nor strict scrutiny as it left absolutely no alternative methods for the Plaintiffs to exercise their First Amendment rights. As the Supreme Court has noted, in "quintessential public forums, the government may not prohibit all communicative activity." *Perry*, 460 U.S. at 45; *see also Goulart*, 345 F.3d at 248 (government may not "prohibit all expressive activity in a traditional public forum").

Notwithstanding the fact that this Court need not determine whether the Troopers' restrictions on Plaintiffs' speech was content-neutral or content-based, the undisputed facts and record clearly demonstrate that Defendants' actions were based on the Plaintiffs' anti-abortion message. The record is replete with evidence that the Defendants' decision to order the Plaintiffs to cease their demonstration was motivated by the Plaintiffs' message, and in particular, their signs depicting aborted fetuses. For example, it is clear that the impetus for the Troopers' initial action in this case resulted from the passing motorists who called the Maryland State Police Barrack. Every single recorded call complaining about the demonstrators on Route 24 primarily relate to the *content* of the Tour's signs. *See supra* note 4 (summarizing all the recorded calls). The callers referred to the signs depicting aborted fetuses as, *inter alia*, "graphic," "extremely inappropriate," "offensive," "gruesome," "disgusting," and "disturbing." *Id.* Moreover, to the extent the callers referenced traffic concerns, those concerns related to the content of the Tour's signs on the motorists ability to drive, and not on the Tour's conduct. *See Swagler v. Neighoff*, 398 F.App'x at 875 (Noting that the callers expressed two sentiments: "(1) disapproval of the public display of *images* of dismembered fetuses, and (2) concern about the *impact of the images* on their own ability and that of others to drive safely.").

Defendants argue, with little supporting evidence, that their actions were not motivated by the subjective motivations of the complaining motorists. Essentially, their argument is that, because some of the motorists' complaints referenced traffic, traffic concerns provided a content-neutral motivation for the initial dispersal order. However, the Defendants actions and statements belie this contention. Trooper Neighoff stated that, in

his opinion, had the Tour's signs depicted cute puppies, or promoted a business, then the calls would never have come in. Neighoff Dep. 333-34. The Troopers repeatedly used the calls complaining about the content of the Tour's signs as the impetus for their actions. *See* MSP Transmission 9 ("[I]t's disturbing billboards that [the Plaintiffs] are carrying. That's why it's called a traffic hazard."); *id.* at 49 ("[W]e had the, the anti-abortionists out there . . . [and] they had signs, real graphic ones"); MSP Complaint Control Card, ECF No. 193-20 ("Traffic complaint—subjects holding a disturbing display of anti abortion billboards . . . received numerous calls, over 20"); MSP Statement of Probable Cause, ECF No. 193-23 ("Several callers stated that the group was displaying signs they thought were offensive for their children to see. I observed the signs that the callers were complaining about."). In arresting the Plaintiffs, the Troopers did not collect evidence or take pictures of any traffic backup, but they did take photographs depicting the *content* of the Tour's signs. *See, e.g.*, Zeller Dep. 127-131.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Moreover, "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers, or simply because bystanders object to peaceful and orderly demonstrations." *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969)). Put simply, there is no heckler's veto to the First Amendment to the United States Constitution. As the United States Court of Appeals for the Third Circuit recently

concluded, "[n]o matter one's personal feelings about abortion, the images [of aborted fetuses] are jarring, their shock value unmistakable. Presumably, that was the point. But 'speech cannot be . . . punished or banned[ ] simply because it might offend' its audience." *United States v. Marcavage*, 609 F.3d 264, 283 (3d Cir. 2010).

The aforementioned facts, taken in the light most favorable to the Defendants, discredit their assertion that their actions were not based on the motorists' complaints regarding the content of the Tour's signs, and clearly indicate that the dispersal order was primarily content-based. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."); *Marcavage*, 609 F.3d at 282 ("where the government regulates speech based on its perception that the speech will spark fear among or disturb its audience, such regulation is by definition based on the speech's content"). Because the Defendants' actions were content-based, this Court must apply strict scrutiny to determine if the Troopers' order to leave Harford County was constitutional—this Court concludes that it was not.[14]

**D. Strict Scrutiny**

In light of the fact that this Court has already concluded that the Troopers' order cannot satisfy the lower intermediate scrutiny standard, this Court need not dwell overly long

---

[14] This Court makes this determination only with regard to Defendants Neighoff, Bradley, Raskinsi, Bohlen, and Mohr. As to Troopers Meades and Nuzzo, there are genuine issues of material fact regarding the extent of their participation and knowledge regarding the dispersal order and the subsequent arrests of the Plaintiffs. Without conclusive evidence, this Court cannot conflate the actions and knowledge of Troopers Neighoff, Bradley, Rasinski, Bohlen, and Mohr, with those of Troopers Meades and Nuzzo. The extent of their involvement and whether or not they are liable for their actions is an issue for trial. For the sake of clarity, however, this Court will continue to refer to the Troopers collectively as "Defendants" with the understanding that this Court's analysis does not touch upon the liability of Troopers Meades and Nuzzo.

on the contours of strict scrutiny. Briefly, to survive strict scrutiny, a government restriction on speech must be the least restrictive means to serve a necessary and compelling state interest. *See Perry*, 460 U.S. at 45. There are two conceivable compelling interests that the Defendants have relied on as the basis for their order to leave Harford County.[15] First, Defendants argue that because the initial demonstration occurred along a 55 mile per hour section of Route 24, the Troopers acted well within the bounds of the Constitution in ordering the Plaintiffs to quit their demonstration. There are two problems with this argument. As a preliminary matter, there is absolutely no evidence that this factor provided the basis for the Troopers' actions on August 1, 2008, and it is clear that this theory was first advanced by the Troopers after litigation commenced in this case. As such, it is improper for this Court to consider this alleged content-neutral justification for the Troopers' dispersal order. *See World Wide Street Preachers Fellowship v. Town of Columbia*, 245 F.App'x 336, 346 (5th Cir. 2007) (unpublished). Second, if the speed limit and categorization of the road in question really played a role in the Troopers' order, it would make little sense to close all of Harford County to the Tour's demonstration—there are undoubtedly hundreds of roads in Harford County with slower speed limits.

The second ground on which the Troopers base their dispersal order is the alleged traffic concerns associated with the Tour's demonstration. Traffic flow is certainly a legitimate government interest. *See Lytle v. Doyle*, 326 F.3d 463, 470 (noting that "the state

---

[15] As previously discussed, the Defendants in this case have not engaged in traditional First Amendment analysis with respect to their order to leave Harford County, with the exception of their repeated mantra that "there is no law that would impose liability for the Troopers' impromptu dispersal order." Defs.' Mot. Summ. J. 32, ECF No. 190. Nevertheless, the Troopers have repeatedly relied on two government interests on which they claim their dispersal order was based.

may act to protect its substantial and legitimate interest in traffic safety" in accord with the First Amendment); *see also Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997). However, this Court need not decide whether the state's legitimate interest in traffic safety rises to a compelling interest under strict scrutiny. Because the Troopers' order was to leave Harford County, the Plaintiffs were afforded absolutely no alternatives to continue their speech. They were given a single choice: either cease their demonstration and leave Harford County, or face arrest. Moreover, the Troopers' actions were not narrowly tailored. There were numerous less burdensome alternatives at the Troopers' disposal.[16] If their concern was truly about traffic, they could have dispatched troopers to direct the flow of traffic,[17] or could have simply moved the Tour to a slower moving section of Route 24. There were ample less burdensome alternatives available to the Troopers—shutting down all of Harford County was not narrowly tailored to meet a compelling government interest. As recently noted by the Third Circuit:

---

[16] Again, this Court need not consider this issue. *See Perry*, 460 U.S. at 45 (where restriction is content-based, courts need only consider whether the restriction was necessary and narrowly tailored to achieve a compelling state interest). However, because the Troopers' order was so broad, had this Court been required to make this determination, it finds that there were ample less restrictive alternatives.

[17] *See Ovadal v. City of Madison Wisconsin*, 416 F.3d 531, 537 (7th Cir. 2005) ("It cannot be denied that drivers who yelled, gestured, and slammed on their brakes when they saw Ovadal's signs created a safety hazard on the Beltline. *However, it is the reckless drivers, not Ovadal, who should have been dealt with by the police* . . . The police must preserve order when unpopular speech disrupts it; does it follow that the police may silence the rabble-rousing speaker? Not at all. The police must permit the speech and control the crowd; there is no heckler's veto.") (emphasis added, internal quotation marks and citation omitted); *see also Ovadal v. City of Madison Wisconsin*, 469 F.3d 625, 630 (7th Cir. 2006) (affirming District Court after remand, and quoting some of the above language from the Court's previous opinion); *accord Rock for Life-UMBC v. Hrabowski*, 411 F.App'x 541, 553 (4th Cir. 2010) (unpublished).

> [W]hile maintenance of the public order is a legitimate objective, its pursuit does not license the government to deprive an individual of a constitutional right irrespective of the circumstances. To conclude otherwise would permit the government to cast off the First Amendment's protective cloak with no more than a scripted invocation of amorphous interests. Our First Amendment jurisprudence requires a far more nuanced approach designed to strike the right balance between competing interests.

*Marcavage*, 609 F.3d at 291. Because the Defendants' actions in this case were not nuanced, and were not the result of any sort of balancing between competing interests, this Court finds that by ordering the Plaintiffs to leave Harford County,[18] and subsequently enforcing that order through summary arrest, the Defendants violated the Plaintiffs' First Amendment free speech rights.

### E. Plaintiffs First Amendment Retaliation Claims

A plaintiff seeking to recover on a First Amendment retaliation claim must establish that "(1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (citation omitted). Here, as demonstrated by the foregoing discussion, it is clear that Plaintiffs can meet the first two prongs of the First Amendment retaliation inquiry. However, on the causal relationship prong, plaintiffs asserting a First Amendment retaliation claim must generally establish "improper motive" on the part of the government actors who restricted their speech. *See*

---

[18] To be clear, this Court holds that the Defendants violated the Plaintiffs First Amendment rights as soon as they issued the blanket order to either leave Harford County or be arrested. "The threat of sanctions may deter [the exercise of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

*Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). Despite the fact that this Court has concluded that the Troopers' actions constituted a content-based restriction on the Plaintiffs First Amendment rights, the record is not sufficient to establish the individual Troopers' motivation behind their actions. Accordingly, because the retaliatory motive of government actors is an element of a First Amendment retaliation claim, such claims "seldom lend themselves to summary disposition." *Ctr. for Bio-Ethical Reform v. City of Springboro*, 477 F.3d 807, 823 (6th Cir. 2007) (internal quotation marks and citation omitted).

The Swagler Plaintiffs recognize that the Defendants' motivation behind their actions constitutes a genuine issue of material fact, and have not moved for summary judgment on their First Amendment retaliation claims. *See* Swagler Pls.' Opp'n 24, ECF No. 210. The Ames Plaintiffs, on the other hand, contend that there exists sufficient evidence in the record for this Court to make conclusions regarding the motives of the Troopers, and have affirmatively moved for summary judgment on this claim. *See* Ames Pls.' Mot. Summ. J. 10, ECF No. 198-1. While the Plaintiffs have certainly put forth evidence suggestive of an improper motive on the part of the Troopers in ordering the Plaintiffs to cease their First Amendment activity, that evidence is not sufficient, and the issue of First Amendment retaliation involves genuine issues of material fact that must be resolved at trial. Accordingly, the Defendants' and Ames Plaintiffs' motions for summary judgment must be denied with respect to the First Amendment retaliation issue.

## III. Fourth Amendment Claims

The Plaintiffs have moved for summary judgment on two separate Fourth Amendment claims. First, Plaintiffs contend that their Fourth Amendment rights were

violated when they were arrested without probable cause. Second, the female plaintiffs argue their Fourth Amendment Rights were violated when Sergeant Bohlen subjected them to allegedly unconstitutional "strip" searches when she briefly looked down the front of the their shirts prior to placing them in the Barrack's holding cells. This Court addresses each claim in turn.

## A. Fourth Amendment Claims Relating to the <u>Arrest</u> of the Plaintiffs

It is well-established that "[t]he Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996). "In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir.1996). More specifically, the circumstances known to the officer at the time of arrest include "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992) (quoting *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)). It is also well established that probable cause must be particularized with respect to the person to be arrested. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("belief of guilt must be particularized") (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)); *see also United States v. Humphries*, 372 F.3d 653, 657-58 (4th Cir. 2004) ("Stripped to its essence, the question to be answered is whether an objectively reasonable police officer, placed in the circumstances,

had a reasonable ground for belief of guilt that was particularized with respect to the person to be searched or seized.") (internal quotation marks and citation omitted).

In Maryland, an officer only has probable cause to make an arrest for a misdemeanor offense if it was "committed in the presence or within the view of the police officer." MD. CODE ANN. CRIM. PROC. § 2-202(b); *Ashton v. Brown*, 660 A.2d 447, 472 (Md. 1995) ("This Court has regularly held that a warrantless arrest by a police officer is legally justified only to the extent that a misdemeanor was actually committed in a police officer's view or presence."); *see also Maryland v. Pringle*, 540 U.S. 366, 370 (2003) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offence *in his presence*, he may, without violating the Fourth Amendment, arrest the offender.") (citing *Atwater v. Lago Vista*, 532 U.S. 318 (2001)) (emphasis added)).

In their own motion for summary judgment, Defendants set forth three grounds on which they argue the Troopers had probable cause to arrest the Plaintiffs. Although the primary justification for the dispersal order was based on a nonexistent Harford County permit ordinance, the three grounds for arrest developed after the arrests had been effectuated and after the Troopers had a chance to discuss possible charges with an Assistant State's Attorney. Nevertheless, the Troopers charged the Plaintiffs with (1) failure to obey a lawful order under MD. CODE ANN., CRIM. LAW § 10-201(c)(2); (2) disorderly conduct under MD. CODE ANN., CRIM. LAW § 10-201(c)(3); and (3) obstructing traffic under HARFORD COUNTY CODE § 193-4(B)(1). However, in their motion for summary judgment, the Troopers do not even mention disorderly conduct as a source of probable cause, and in their opposition to the Plaintiffs' motion for summary judgment, essentially abandon the

failure to obey a lawful order justification and concentrate only on the Harford County ordinance regulating traffic flow. *See* Defs.' Mot. Summ. J. 18-21, ECF No. 190-3; Defs.' Opp'n 5, ECF No. 208-1. Regardless, this Court will briefly address each potential source of probable cause.

First, the offense charging the Plaintiffs with failure to obey a reasonable and lawful order is contingent on the order being both reasonable and lawful. *See* MD. CODE ANN., CRIM. LAW § 10-201(c)(2). As demonstrated above, the order to obtain a permit or leave Harford County was neither reasonable nor lawful—indeed, the alleged permit requirement did not exist, and the order to leave Harford County was clearly unconstitutional. As such, the failure to obey a lawful order statute cannot serve as the basis for probable cause. *See Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (noting that a person faced with an unconstitutional order to obtain a permit prior to engaging in First Amendment activity "may ignore it and engage with impunity in the exercise of the right of free expression").

Next, in arresting the Plaintiffs, the Troopers relied on the Maryland disorderly conduct statute. Perhaps sensing the inadequacy of the facts in the record to support this argument, the Troopers have not even attempted to justify their actions based on this theory. First, mere questioning of police authority does not generally rise to the level of disorderly conduct. *See Diehl v. State*, 451 A.2d 115, 120 (Md. 1982) (noting that "where, as here, a person is acting in a lawful manner . . . and is the object of an unlawful police order, it is not usually a criminal violation for such a person to verbally protest a police officer's insistence upon submission to such an order," in the context of an arrestee slinging obscenities at arresting officer). Second, the record clearly indicates that the arrestees were anything but

disorderly—the Troopers involved in the arrest generally described the arrestees as "very polite," "cooperative and calm," "very respectful," and "friendly." Mohr Dep. 55; Dupre Dep. 29; Bradley Dep. 153; Meades Dep. 30; *see also* Arrest Video, ECF No. 47 Ex. 8 (video evidence depicting calm and orderly arrestees).

Finally, the Troopers spend most of their argument capital on the Harford County ordinance regulating the obstruction of traffic. However, this reliance is misplaced. For one thing, Harford County Code Section 193-4(D) explicitly exempts "orderly and legal picketing or other lawful assembly" from the activities is proscribes. Furthermore, the ordinance regulates *conduct* that obstructs traffic and not *speech*. *See* HARFORD COUNTY CODE § 193-4(B)(1) ("It shall be unlawful for any person to . . . *stand* . . . in a public place in such a manner as to . . . [o]bstruct any public street, public highway, or public sidewalk . . . by hindering or impeding or tending to impede the free and unimpeded passage of vehicles, traffic, or pedestrians.") (emphasis added). The Troopers argue that this ordinance "prohibits *any* effort to distract drivers, even if the person attempting to distract drivers is standing on the side of the road." Defs.' Opp'n 6, ECF No. 208-1 (emphasis added). Under this broad reading of the ordinance, every person or entity who seeks any attention from passing motorists, whether it be political supporters during an election, school children soliciting donations, pro-life demonstrators, or even commercial advertisers would potentially run afoul of the county ordinance. Indeed, by their very nature, commercial billboards seek attention from passing motorists, and under the Troopers' reading of the traffic ordinance, could be prohibited if the content of those billboards angered drivers.

As previously discussed at length, efforts to restrict speech must be subject to at least some level of balancing, and traditional public fora alongside roads cannot be completely shut off for expressive activity on grounds of the possibility of traffic disruption. Moreover, even if there was a significant traffic disruption, a proposition that is not supported by the record, *see* Tour Video, Swagler Pls.' Mot. Summ. J., Ex.25, motorists reaction to speech cannot serve as the basis for restricting speech—there is no heckler's veto. *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970).

Finally, the Defendants make no effort to satisfy the particularization prong of the probable cause analysis. Indeed, the statements of probable cause, drafted by the Troopers after the Plaintiffs' arrest, are identical for every Plaintiff in this action. *See* MSP Statement of Probable Cause, ECF No. 193-23. The Plaintiffs were simply among the eighteen people arrested on August 1, 2008, and the Maryland State Troopers made no effort to establish which plaintiffs engaged in which allegedly prohibited behavior. Moreover, the Troopers have set forth no evidence, or argument for that matter, to establish whether the misdemeanor crimes allegedly committed by the Plaintiffs were "actually committed in [the] police officer's view or presence." *Ashton*, 339 Md. At 122. "Courts ought not to be obliged to do a litigant's homework for him," *Marcavage*, 609 F.3d at 287 (quoting *United States v. Calderon-Pacheco*, 564 F.3d 55, 58 (1st Cir. 2009)), and this Court will not strive to concoct an argument for the government on this matter. Put simply, the Troopers did not have probable cause to arrest the Plaintiffs for obstructing traffic, disobeying a lawful order, or disorderly conduct. Accordingly, the Defendants violated the Plaintiffs' Fourth Amendment rights to be free from unreasonable seizures.

***B.   Fourth (and Fourteenth) Amendment Claims Relating to the <u>Search</u> of the Plaintiffs***

The parties have cross-moved for summary judgment on the Plaintiffs Fourth Amendment unreasonable search claims.   Specifically, in Count IV of their Second Amended Complaint, the Swagler Plaintiffs allege that they were subject to unconstitutional sexually invasive "strip" searches conducted by Sergeant Dona Bohlen.   Swagler 2d. Am. Compl. ¶¶ 151-56, ECF No. 125.   Plaintiffs Beeson and Ward, of the Ames Plaintiffs make similar allegations in their own Second Amended Complaint.   Ames 2d. Am. Compl. ¶¶ 109-115, ECF No. 168.   The Plaintiffs' Second Amended Complaints actually contemplate two separate "strip" searches: one conducted by Sergeant Bohlen at the Maryland State Police Barrack, and the other conducted by a Harford County employee at a separate location. While the second search was arguably more intrusive, only the first is at issue here as Harford County has reached a settlement with the Plaintiffs.   The Swagler Plaintiffs and Sergeant Bohlen have cross-moved for summary judgment on the Swagler Plaintiffs' claim that Sergeant Bohlen conducted gender-specific "strip" searches of the female arrestees in violation of the Fourteenth Amendment's equal protection clause.

The facts on this matter are undisputed—and both parties refer to Sergeant Bohlen's own statements for support.   Specifically, Sergeant Bohlen, stated that she "ran [her] fingers . . . on the inside of the waistband of [the female arrestee's] pants to ensure nothing harmful [was] in these areas. . . . [She] also looked down the front of their shirt[s] to ensure no items were wedged in their bra[s]."   Bohlen Decl. ¶¶ 18.

The Fourth Circuit has defined the term "strip search" as an "unnecessarily intrusive search"—a term that must be considered in light of each case's unique context and facts. *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001). In a previous Memorandum Opinion, this Court stated that "Plaintiffs' allegations *could* support a finding that the search conducted by Sgt. Bohlen was an unconstitutional 'strip search,'" and let the Plaintiffs' claims proceed to discovery. Mem. Op. May 10, 2010, ECF No. 155 (emphasis added). After discovery, it is clear that the search at the Maryland State Police Barrack did not rise to the level of an unconstitutional strip search. The Fourth Circuit has held that the standard for evaluating the constitutionality of searches incident to arrest is "whether the search was *unreasonable*." *Amaechi*, 237 F.3d at 361. Moreover, "[a] strip search under federal law includes the exposure of a person's naked body for the purposes of a visual or physical examination." *Id.* At 363 (citing *United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir. 1997). Here, it is clear that Sergeant Bohlen, a female officer, briefly looked down the shirts of the female arrestees for the sole purpose of discovering contraband. Under the circumstances, merely looking quickly down the shirt of the female arrestees was actually less intrusive than manually or physically inspecting or manipulating the area around the bra where items could be secreted. As a result, this Court concludes that the searches conducted by Sergeant Bohlen were reasonable searches incident to arrest, and did not rise to the level of unconstitutional strip searches. *See Amaechi*, 237 F.3d at 363; *accord Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Along the same lines, Plaintiffs' equal protection "gender-specific strip search" claims also fail. Plaintiffs do not allege that the male arrestees were not searched while the female arrestees were. On the contrary, the only difference between the two sets of searches, was

that the male arrestees were not subject to the brief bra area inspection conducted by Sergeant Bohlen on the female arrestees. This minor difference in the search protocol for female and male arrestees does not rise to the level of an unconstitutional "gender-specific strip search." *See Jones v. Murphy*, 470 F. Supp. 2d 537, 548 (D. Md. 2007) (finding an unconstitutional gender-specific search when one gender was subject to search, and the other was not).

## C. Ames Plaintiffs' Fourth Amendment Excessive Force Claim

In Count VI of their Second Amended Complaint, the Ames Plaintiffs contend that Troopers Bradley, Meades, Mohr, Neighoff, Nuzzo, and Rasinski used excessive force when they restrained the Ames Plaintiffs with tight handcuffs, and allegedly pushed Plaintiff Beeson to the ground. Ames Pls. 2d. Am. Compl. [paragraph x2] 116-18, ECF No. 168.

A claim citing the use of excessive force during the course of an arrest is analyzed under the Fourth Amendment's[19] "objective reasonableness standard." *Orem v. Rephann*, 523 F.3d 442, 445-46 (4th Cir. 2008). Under this standard, reviewing courts observe that while "not every push or shove, even if it may later seem unnecessary is serious enough to entail a deprivation of a constitutional right," a claim may succeed if the arresting officers' conduct is found to be "wanton, sadistic, and not a good faith effort to restore discipline." *Id.* at 447 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). While constitutional violations of excessive force may be sustained even if the injury complained of is *de minimus*, the Supreme

---

[19] Although the Ames Plaintiffs have cited the Fifth Amendment as the ground for their excessive force claim, this Court has previously noted that the "parties acknowledge that the excessive force claim in Count VI is properly brought under the Fourth Amendment." Mem. Op. May 4, 2010, ECF No. 61.

Court has stated that the proper inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkens v. Gaddy*, __ U.S. __, 130 S. Ct. 1175, 1178 (2010) (internal quotation marks and citation omitted).

Here, there is no evidence that the Troopers' actions with regard to securing the Plaintiffs after arrest were anything but objectively reasonable. This Court has recently noted that routine handcuffing with minor affiliated injuries does not amount to excessive force. *Roberts v. Durst*, No. AW-09-1385, 2010 WL 3703296, at *4-5 (D. Md. Sept. 16, 2010). Moreover, the Plaintiffs are unable to determine who among the listed Troopers is even alleged to have inflicted the minor injuries of which the Plaintiffs complain. Quite simply, there is nothing in the record indicating that the Troopers' acted maliciously or sadistically, and as a result, their Fourth Amendment excessive force claim must fail. Accordingly, the Troopers are entitled to summary judgment on the Ames Plaintiffs' excessive force claim.

## IV. Defendants Are Not Entitled to Qualified Immunity

Having concluded that the Defendants violated the Plaintiffs' First Amendment free speech and Fourth Amendment rights to be free from unreasonable seizure, this Court next addresses whether the Troopers' actions are nonetheless shielded by the doctrine of qualified immunity. Qualified immunity acts as an absolute bar to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008). In determining whether an officer must be afforded qualified immunity, courts have traditionally engaged in a two-step analysis. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). First, a court determines whether a constitutional right has been violated. Second, "assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir.2002) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). The United States Supreme Court has recently modified this approach in order to make it more flexible; courts no longer have to consider the two prongs of the analysis sequentially, but may now review them in the order deemed to be most efficient. *Pearson v. Callahan*, 555 U.S. 223 (2009) ("[t]he judges of the district courts and courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

As discussed above, the Plaintiffs have established that the Defendants violated their constitutional rights. Therefore, this Court must necessarily decide whether those rights were clearly established. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While the precise activity of the officers need not have been addressed in prior

cases, the Supreme Court has suggested that "in light of the preexisting law the unlawfulness [of the action] must be apparent." *Anderson*, 483 U.S. at 640; *see also Hutchinson v. Lemmon*, No. 10-1925, 2011 WL 2580349, at *4 (4th Cir. June 30, 2011) ("We repeatedly have held that there is no requirement that the precise right allegedly violated already have been recognized specifically by a court before such right may be held 'clearly established' for qualified immunity purposes.") (collecting cases).

The Troopers essentially argue that because no prior case law addresses "impromptu dispersal orders," the unlawfulness of their actions could not be readily apparent. This argument, however, avoids the fact that the Troopers' order restricted the Plaintiffs speech by shutting down all of Harford County to the Plaintiffs' expressive activity. The relevant inquiry therefore is whether it would be apparent to a reasonable police officer that their closing of Harford County to the Plaintiffs' pro-life demonstration after receiving complaints from passing motorists about the content of the signs violated the Plaintiffs' First Amendment rights. *Pritchett*, 973 F.2d at 312. Furthermore, in the Fourth Amendment context, this Court must ask whether it would be readily apparent to a reasonable police officer that they lacked probable cause to arrest the Plaintiffs. *Id.*

For the purposes of qualified immunity, it is firmly established that the First Amendment does not allow content-based restrictions on speech in response to a hostile response from onlookers, *Bachellar*, 397 U.S. at 567, and even if the restrictions are content-neutral, an entire county cannot be shut down, *Perry*, 460 U.S. at 45. Here, regardless of whether the Troopers' concerns for traffic rose to a level of a significant or compelling state interest, the order to leave Harford County was not narrowly tailored to that interest. As

such, a reasonable police officer would have known that ordering demonstrators to leave an entire county was unconstitutional. As if to crystallize this notion, the reaction of a separate police department to the Plaintiffs' demonstration is illustrative. The Harford County Sheriff's Department ("HCSD") received calls from angry motorists in the same fashion as the Maryland State Police. However, instead of deploying officers to order protestors out of the county, the HCSD operators told callers that they could do nothing unless the demonstrators were actually in the roadways obstructing traffic. See HCSD Tr. 7, ECF No. 193-18. After recognizing the free speech concerns, and concluding that there was no basis on which to order the Plaintiffs to cease their demonstration, and no basis for the subsequent arrest, the Harford County Sheriff specifically told his officers not assist the Maryland State Police with the arrest. *See* Bane Dep. 41-42, 56-57. The HCSD specifically refused to assist the Maryland State Police on August 1, 2008—something it rarely does. *Id.* at 27; Mina Dep. 18-19.

The Troopers rely to a great degree on a similar case decided by the Eighth Circuit. In *Frye v. Kansas City Missouri Police Department*, five pro-life demonstrators were arrested after they refused to obey a police order to cease using their signs depicting aborted fetuses. 375 F.3d 785, 788-89 (8th Cir. 2004). The Troopers argue that because the court in *Frye* found that the officers' actions were protected by qualified immunity, this Court should find the same. However, the *Frye* case is easily distinguishable. As the Eight Circuit noted, "[t]he district court emphasized that the officers had not forbidden the demonstrators to display any of the large photographs of mutilated fetuses, but only restricted the place where they could be shown in order to avoid a traffic hazard." *Id.* at 789. Here, the Troopers gave the

Plaintiffs absolutely no alternatives, and that is enough to conclude that a police officer confronted with a similar situation would be aware that his actions violated the Plaintiffs' free speech rights.[20]

In the Fourth Amendment arena, this Court has recently noted that the "requirement that an officer have probable cause to seize and arrest an individual has been clearly established constitutional law for decades." *McDaniel v. Maryland*, No. RDB-10-189, 2010 WL 3260007, at \*8 (D. Md. Aug. 18, 2010). The Troopers purportedly acted according to a Harford County permit ordinance—however, not a single Trooper bothered to locate, read, evaluate, or understand the ordinance before suppressing the Plaintiffs' speech and subsequently arresting them. This, by itself is unreasonable. *See, e.g.*, *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("It is the officer's responsibility to know what he is arresting for, and why").

Additionally, Trooper Mohr's brief conversation[21] with Assistant State's Attorney Lewis is not sufficient to cloak the Troopers' actions in the protection of qualified immunity. Mr. Lewis specifically noted that he did not have a copy of the Harford County Code, and stated, in essence, that he would need to research whether the Plaintiffs' actions constituted any violation of state or county law. Mr. Lewis never gave his authorization to Trooper

---

[20] The *Frye* case is distinguishable on other grounds as well. For example, the *Frye* court concluded that the officer's conduct was *not* motivated by the content of the signs depicting aborted fetuses. *Frye*, 375 F.3d at 790. Moreover, as noted by the Fifth Circuit, "it is unclear how the [*Frye* court] arrived at the conclusion that the officers' actions were not motivated by the content of the signs; therefore, the evidence may be markedly different." *World Wide Street Preachers Fellowship v. Town of Columbia*, 245 F.App'x 336, 348 (5th Cir. 2007) (unpublished).

[21] It is undisputed that Trooper Mohr had two separate conversations with SA Lewis. However, the second conversation took place *after* the Plaintiffs were arrested, and cannot, therefore, be a basis of probable cause.

Mohr to order the Plaintiffs out of the county, and never stated that probable cause existed to arrest the demonstrators.  *See* MSP Transmission 35-39.

In sum, a reasonable police officer faced with the facts confronted by the Defendants would have known that, in ordering the demonstrators to leave Harford County, he would violate the Plaintiffs' First Amendment rights.  Moreover, arresting the Plaintiffs for exercising those rights was a violation of the Plaintiffs' Fourth Amendment rights.  "In engaging in this manifestly unlawful behavior, the individual officers could not have reasonably misapprehended the law, nor can it be said that they made a bad guess in a gray area."  *Hutchinson v. Lemmon*, No. 10-1925, 2011 WL 2580349, at *5 (4th Cir. June 30, 2011) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004), and *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (internal quotation marks and alterations omitted).  Troopers Neighoff, Bradley, Rasinski, Bohlen,[22] and Mohr are accordingly not entitled to qualified immunity, and the Plaintiffs are entitled to summary judgment on their First Amendment, and Fourth Amendment unreasonable arrest claims.

## V.  Fourteenth Amendment Claims

The Ames Plaintiffs assert various Fourteenth Amendment due process claims against the Troopers.  *See* Ames Pls.' 2d Am. Compl. Counts III, VII, and VIII, ECF No. 168.  As the Fourth Circuit has already dismissed similar claims from the Swagler Plaintiffs'

---

[22]  While the Plaintiffs have moved for summary judgment separately against Trooper Bohlen, this Court's analysis applies with equal force to her with respect to the Plaintiffs' First Amendment, and Fourth Amendment unreasonable arrest claims.  As discussed *supra*, however, Trooper Bohlen did not violate the Plaintiffs' Fourth Amendment rights with respect to Bohlen's search of the female plaintiffs.

complaint, *Swagler v. Neighoff*, 398 F.App'x 872, 879 (4th Cir. 2010),[23] this Court need not address this issue further. This Court finds that the Fourth Circuit's analysis applies with equal force to the Ames Plaintiffs' Fourteenth Amendment due process claims, and as a result, the Defendants are entitled to summary judgment on those claims.

## VI.  Damages, Equitable and Injunctive Relief Claims

As a result of the Defendants' unconstitutional actions, the Plaintiffs are entitled to damages. The amount of damages however, as acknowledged by the Plaintiffs, is a matter for trial. With respect to the equitable and injunctive relief sought by the Plaintiffs, this Court cannot conclude at this juncture whether such relief is required. Moreover, whether injunctive relief is required will, in part, turn on the separate issue[24] of the Plaintiffs' official capacity claims against Colonel Terrence Sheridan, the Superintendent of the Maryland State Police. As such, the issue of damages will be decided at trial, and the issue of injunctive relief must wait until after discovery has been completed on the official capacity claims against Colonel Sheridan.

## VII.  State Law Claims

### A.  *Common Law Claims*

---

[23]  One count arising under the Fourteenth Amendment is asserted against certain municipal defendants and supervisory officers only, and is not relevant here. Swagler 2nd Am. Compl. ¶ 137.

[24]  Pursuant to *Marryshow v. Bladensburg*, 139 F.R.D. 318 (D. Md. 1991), this Court bifurcated the official capacity claims against Colonel Sheridan, and allowed discovery to proceed only in relation to the Plaintiffs' claims against the Troopers in their individual capacities. *See* Mem. Op. April 13, 2010, ECF No. 150. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Pursuant to this Court's earlier opinion, the Swagler Plaintiffs' common law claim for false arrest has been dismissed, and their claim for assault and battery was allowed to proceed only against Trooper Bohlen with respect to the claimed sexually invasive searches she performed on the female plaintiffs. *See Swagler v. Harford County*, No. 08-2289, 2009 WL 1575326m, at *4-5 (D. Md. June 29, 2009). The Ames Plaintiffs have brought common law claims for false arrest, false imprisonment, and malicious prosecution. Ames Pls.' 2d Am. Compl. Counts IX-XI. The Troopers claim that they are entitled to qualified statutory immunity under Maryland law. The Defendants claim immunity under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't §§ 12-101, *et seq.*

The MTCA serves as a limited waiver of sovereign immunity and it provides the sole means by which the State of Maryland and its personnel may be sued in tort. The statute grants immunity to state personnel "from liability in tort for a tortious act or omission that is within the scope of [their] public duties . . . and is made without malice or gross negligence . . . ." MD. CODE ANN., CTS & JUD. PROC. § 5-522(b).

Under state statutory immunity, the protection afforded is of a qualified nature—that is, defendants are shielded from liability as long as they act without malice. Under Maryland law, "malice" is defined by reference to "actual malice," as "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Shoemaker v. Smith*, 353 Md. 143, 163 (1999) (quoting *Leese v. Baltimore County*, 64 Md. App. 442, 480 (1985)). Plaintiffs asserting malice are held to a high pleading standard that may not be satisfied by conclusory allegations. *See Elliott v. Kupferman*, 58 Md. App. 510, 528 (1984) ("[m]erely asserting that an act was done

maliciously, or without just cause, or illegally, or for improper motive does not suffice. To overcome a motion raising governmental immunity, the plaintiff must allege with some clarity and precision those facts which make the act malicious); *Hovatter v. Widdowson*, No. CCB-03-2904, 2004 WL 2075467, at *7 (D. Md. Sept. 15, 2004) ("although the amended complaint repeatedly states that all of the defendants acted with malice towards [Plaintiff] . . . these bare legal conclusions are not binding on the court.").

As noted in this Court's previous opinion, "[t]he only allegations that could potentially support a finding of malice relate to the strip search[ ]." *Swagler*, 2009 WL 1575326, at *5. As discussed *supra*, the so-called "strip" search conducted by Sergeant Bohlen was not unduly invasive and cannot support a finding of malice. Accordingly, the Defendants are entitled to summary judgment on the Plaintiffs state common law claims.

### B. Claims Arising Under the Maryland Declaration of Rights

In addition to the Ames Plaintiffs' federal claims, they assert claims under the Maryland Declaration of Rights. With respect to those claims, the Court of Appeals of Maryland has "often commented that . . . state constitutional provisions are *in pari materia* with their federal counterparts." *Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 805 A.2d 1061, 1071 (Md. 2002); *see also Miller v. Prince George's County*, 475 F.3d 621, 631 n.5 (4th Cir. 2007). Moreover, this Court has noted that the only "major distinction between the state constitutional claims and the federal claims is that Maryland does not recognize the defense of qualified immunity for officials committing state constitutional violations." *Walker v. Prince George's County*, No. AW-07-123, 2008 WL 7555247, at *5 (D. Md. March 31, 2008) (citing *Miller*, 475 F.3d at 631).

As such, this Court's First and Fourth Amendment constitutional analysis applies equally to the Ames Plaintiffs' corresponding state constitutional claims, and as a result, they are entitled to summary judgment on those claims.

## CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment (ECF No. 190) is granted in part  and denied in part; the Swagler Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 193) is granted; the Ames Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 198) is granted in part and denied in part; the Swagler Plaintiffs' Motion for Summary Judgment against Defendant Bohlen (ECF No. 195) is granted in part and denied in part; and the Ames Plaintiffs' Motion for Summary Judgment against Defendant Bohlen (ECF NO. 199) is similarly granted in part and denied in part.

Given the current disposition, it is necessary for the parties to proceed to trial on the following issues: (1) the amount of damages Plaintiffs suffered as a result of the Defendants' unconstitutional actions; (2) the extent of Troopers Meades and Nuzzo's involvement in issuing the dispersal order and the subsequent arrest of the Plaintiffs; and (3) the Plaintiffs' First Amendment retaliation claims.


A separate Order follows.

Dated: July 12, 2011                          /s/_____
                                              Richard D. Bennett
                                              United States District Judge